72 F.Supp. 695 (1947)
HOWARD
v.
THOMPSON et al.
No. 4452.
District Court, E. D. Missouri, E. D.
August 1, 1947.
*696 Henry D. Espy and Victor Packman, both of St. Louis, Mo. (Charles H. Houston, of Washington D. C., of counsel), for plaintiff.
M. G. Roberts, A. P. Stewart, S. G. Ray, and A. J. Baumann, all of St. Louis, Mo., for carriers.
W. Donald Dubail and Charles R. Judge, both of St. Louis, Mo., for defendants Carnahan and Brotherhood of Railroad Trainmen.
DUNCAN, District Judge.
Plaintiff is a resident and citizen of the State of Tennessee. The defendant St. Louis-San Francisco Railway Company is a corporation organized under the laws of the State of Missouri, with its principal place of business in the City of St. Louis. The defendant St. Louis-San Francisco & Texas Railway Company is a corporation organized under the laws of the State of Texas. Defendant Frank A. Thompson, trustee of the corporate defendants, is a resident and citizen of the City of St. Louis, Missouri. The defendant Brotherhood of Railroad Trainmen is a voluntary organization, and C. O. Carnahan is General Chairman of the Brotherhood of Railroad Trainmen, with headquarters in Springfield, Missouri.
The defendants will be hereafter referred to as the "Carriers" and as the "Brotherhood."
Plaintiff, a train porter, an employee of the trustee of the St. Louis-San Francisco Railway Company, seeks to enjoin the defendant trustee from discharging him and approximately 125 other train porters in the employ of the defendant Carriers, and to enjoin the defendant Brotherhood of Railroad Trainmen from coercing the defendant trustee to abolish the position of train porter on trains of the Carriers, and to void a contract entered into between the trustee and the Brotherhood of Railroad Trainmen on March 7, 1946, under the terms of which it was agreed that the trustee would in the future prohibit train porters from performing any of the duties or functions of brakemen on passenger trains.
Plaintiff and those in whose behalf he brings this suit, are members of the Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Incorporated, an organization composed entirely of negroes employed in various capacities by carriers. The membership of the Brotherhood of Railroad Trainmen is composed of brakemen, yardmen, etc.
Plaintiff has been in the employ of the St. Louis-San Francisco Railway Company and Frank A. Thompson, its trustee, about 33 years. During part of that time he was employed as a freight brakeman, but because of an injury rendering him physically incapable of carrying on the duties of brakeman, he was employed as a porter.
For approximately 40 years, plaintiff and those in whose behalf he brings this suit, in the performance of the duties and functions assigned to them, have been known and designated by the Carriers as "train porters," and during all of that time, either in accordance with custom or orders of their employers, they have performed some or all of the functions ordinarily classified as duties of brakemen on passenger trains, i. e., to assist in the operation of the train, receive and transmit orders to the conductor, engineer and the firemen, throw switches, flag trains and such other and further duties as might be required of them by the conductor in charge of the train.
Train porters have for many years been composed entirely of negroes, and according to the testimony, although they have performed all of the functions and duties of a head-end passenger brakeman in addition to their general duties of assisting passengers to board and alight from trains, keep the cars, steps and other facilities clean and free from accumulation of dirt and debris, their salaries, with the exception of a short period of time during World War I, have been materially less than those received by white brakemen who were not required to clean cars and to generally assist passengers off and on trains.
For a long period of time there has been a controversy between the Brotherhood of Railroad Trainmen and the Carriers concerning the performance of so-called brakemen duties by train porters. In fact, there has been a controversy of long standing between the white employees of the Carriers and the Carriers respecting employment of negroes. In 1928 this culminated *697 in a contract entered into between the Carriers and the Brotherhood that in the future negroes would not be employed as brakemen or firemen. Since that time no negroes have been employed for service in either of those capacities. However, those negroes who were already in the employ of the Carriers, as firemen and brakemen continued in their employment, and under the terms of the contract, their rights of seniority were to be preserved.
The controversy between the Brotherhood and the Carriers with respect to the performance of brakemen's duties by the porters, finally resulted in a contract entered into between the Brotherhood and the Carriers on March 7, 1946, as the result of the threatened strike in 1945. Case No. 3 was among the cases submitted to the members for a vote. Mr. King, Assistant to the Chief Operating Officer of the St. Louis-San Francisco Railway Company testified that the Carriers reluctantly entered into the contract to prevent a strike, the Brotherhood insisting that its demands must be agreed to or the members would strike. There was no demand on the part of the Brotherhood to discharge the train porters.
Subsequent to entering into said contract, the Carriers determined that if train porters were not permitted to perform the functions of brakemen as in the past, their services were no longer economically desirable, and they notified this plaintiff and all other train porters, that the position of train porter, except chair car porters, would be abolished, and required all persons holding such positions to turn in their equipment on April 1, or as soon thereafter as their duties and responsibilities would permit.
Upon receipt of said notice, the plaintiff instituted this suit, alleging that he, and those in whose behalf this suit is brought, are in fact brakemen by virtue of the particular functions they perform, and that as such, it was the duty of the Brotherhood of Railroad Trainmen under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., to represent their interests and not to discriminate against them; that the contract so entered into was discriminatory, void and in violation of the constitutional rights of such persons; that the porters are entitled to the benefits of any contractual relation resulting from negotiations between the Brotherhood and the Carrier.
Plaintiff also alleges that he, and those in whose behalf he brings this suit, "have no administrative or statutory remedies to maintain the status quo of their jobs or their seniority, disability and retirement rights or to prevent their economic displacement, and no adequate remedies at law." He seeks to enjoin the defendant Carriers from discharging such persons, and to void the contract between the Carriers and the Brotherhood, and to enjoin the Brotherhood from obtaining the benefits of the agreement negotiated with the railroads on March 7, 1946, and from taking over the jobs of the plaintiff and other train porters under said agreement, or any similar agreement or conspiracy to deprive citizens of the United States of a livelihood because of their race or color. A temporary restraining order was granted to restrain the Carriers from discharging plaintiff and those in whose behalf this suit was brought.
The by-laws of the Brotherhood of Railroad Trainmen excludes negroes from membership, except in states in which such exclusion is prohibited by law, and in those states the exclusion is successfully effected by means of the "blackball." The Brotherhood of Railroad Trainmen is a fraternal organization composed of white persons belonging to a certain craft in their employment by the Carriers, and admission to membership is gained after a certain period of employment by the Carrier, by application submitted to the proper officers of the Brotherhood, and by ballot. Applicants may be rejected by means of the "blackball." There are no negro members of the Brotherhood of Railroad Trainmen. The evidence tends to show that in the past there have been a few attempts on the part of negroes to join that Brotherhood, but they have not been permitted to do so.
Apparently the train porters were unorganized and without representation as a group prior to about February 1921. For many years prior to World War I persons performing the duties of the plaintiff and his group had been designated by the railroads *698 as "train porters" and had come to be recognized throughout the railroad industry as a class, and their pay, as heretofore stated, was considerably less than the pay of brakemen, who were white men, performing only the duties of brakemen.
On December 2, 1918, William G. McAdoo, Director General of Railroads, issued an order equalizing the pay of those persons performing the duties that train porters were then performing, and have since performed. Which order is as follows:
"1. Employees in a passenger train crew, except conductor, collector and baggagemaster, qualified and regularly required to perform the following essential duties, will be designated as passenger brakemen or flagmen and paid accordingly:
"(a) Inspect cars and test signal and brake apparatus for the safety of train movement.
"(b) Use hand and lamp signals for the protection and movement of trains.
"(c) Open and close switches.
"(d) Couple and uncouple cars and engines and the hose and chain attachments thereof.
"(e) Compare watches when required by rule.
"2. Where white brakemen are not employed, the compensation and overtime rule for colored brakemen shall be the same, for both passenger and freight service, as for the same positions on the minimum paid contiguous road.
"3. This order shall not curtail the duties of employees heretofore classed as `train porters.'
"4. This order shall not infringe upon the seniority rights of white trainmen."
 "Signed W. G. McAdoo
 "Director General of Railroads."
This order continued in effect until February 1, 1921 although the title "train porters" continued to be recognized by the railroads. When the railroads were turned back to their owners, and effective February 1, 1921, the railroads reclassified the train porters in so far as their pay was concerned, although their duties remained the same, and reduced their rate of pay materially below that which they were receiving under the Director General's order.
In a proceeding against the Frisco Railway in protest against a reduction in wages, the first organization of train porters came into existence. This was designated a "Proceeding by more than 100 employees against the Frisco Railway in protest against reduction in wages effective February 1, 1921 applying to all colored trainmen working the head-end of passenger trains." This committee represented the "train porters." The protest of this group was ineffectual in bringing about a rescission of the order. In September 1921 the Frisco Railway negotiated an agreement effective February 11, 1921, with Sandy Eslinger, acting as general chairman of the group of train porters. Subsequently 112 of the 145 employees concerned, signed a written ratification of that agreement. Sandy Eslinger continued to represent the train porters from 1921 until about 1930. Some time during that period a charter was granted by the American Federation of Labor to the "Trainmen, brakemen and porters' union," but was subsequently revoked. Thereafter the "Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Incorporated" was organized. The porter group was included in this labor organization.
On February 2, 1944, the B. T. B. P. S. F. & R. Employees, Incorporated, negotiated and signed on agreement with the trustees of the Frisco Railway defining rates of pay, and for separate seniority rosters of train porters and chair car porters, and in a limited way, the duties to be performed by train porters, the agreement being headed "Agreement between J. M. Kurn and Frank A. Thompson, Trustees St. Louis-San Francisco Railway Company, Debtor, and Train Porters and Chair Car Porters represented by the Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Incorporated." As set out in the contract, Article II Rule 2, with respect to the duties of porters, provided:
"Porters when on duty will be under the jurisdiction of conductor and will perform such duties as may be required." * * *
*699 Article X Rule 27 provided:
"Train porters will load and unload train boxes, clean and fill lamps and perform such other duties as may be assigned to them by proper authority."
Rules of the Transportation Department define duties of all trainmen, including train porters and they were required to pass a physical examination, carry standard watches, etc. The contract was signed on behalf of "Train Porters and Chair Car Porters by L. H. Hoyl, General Chairman and Vernon C. Coffey, Director-General Attorney, and L. W. Fairchild, General President."
A further contract was entered into on September 22, 1944, providing some changes in the original contract signed on February 3, 1944, with respect to compensation, vacations, etc.
On July 31, 1946, a contract was entered into between Frank A. Thompson, trustee of the St. Louis-San Francisco Railway Company with train porters and chair car porters represented by the Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Incorporated, revising the rates of pay as determined by the prior contracts. By agreement, this contract was signed without prejudice to this action, which was pending at that time.
On December 21, 1945, the Brotherhood caused to be spread among its members employed in the train and yard service of Carriers, a strike ballot, including 12 cases. Case No. 3, the one involving the train porters, read:
"Complaint of Brotherhood of Railroad Trainmen against train porters being used to perform the duties of brakemen on passenger trains on all the lines of the SL-SF Railway Co. and SL-SF & Tex. Railway Co. and claim that additional brakemen covered by and paid under the respective brakemen agreements should be used to perform the duties of brakemen now being performed by train porters, and claim of brakemen dated August 2, 1945 be sustained."
Subsequent to the spreading of this ballot, defendant C. C. Carnahan as general chairman of the Brotherhood advised C. P. King, Assistant Chief Operating Officer of the Frisco by letter that:
"You are hereby notified that a strike of yard and road service employees under the jurisdiction of the Brotherhood of Railroad Trainmen will be effective 6:00 PM Sunday, January 6, 1946."
Pursuant to a request by the Carriers, an Emergency Board was created by the President of the United States, pursuant to Title 45 U.S.C.A. § 160. This Board convened in the City of St. Louis where hearings were held. The train porters, acting through the Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Incorporated, made application to intervene in the proceeding before said Board, and their application was denied. Thereupon the train porters filed a motion before the Emergency Board for reconsideration of the denial of their petition, which was also denied.
In denying the petition of the train porters, the Emergency Board in its report to the President of the United States, recommended with respect to Case No. 3 that it, with others "be processed for submission to the National Railroad Adjustment Board, in the event they cannot be disposed of satisfactorily on the property." Thereafter negotiations between the Carriers and the Brotherhood were continued until a settlement was reached. At no time was the representative of the train porters present during the negotiations. With respect to Case No. 3 the settlement provided:
"Effective April 1, 1946, the practice of train porters performing work generally recognized as brakeman's duties will be discontinued. Claims of certain brakemen who were available for the date of August 2, 1945, where claims have been submitted to be paid."
It was pursuant to this agreement that the order abolishing train porter positions and discharging train porters was issued.
The train porters were performing their duties in an efficient manner, and no complaint was expressed against them by their employers, and there was no desire on the part of the Carriers prior to March 7, 1946, to abolish train porter jobs. In response *700 to a question by Mr. Packman as to whether there was a desire on the part of the Carriers prior to March 7, 1946, to retain train porters on the runs as usual, Mr. King answered"I think it can be fairly stated that that was our preference." Their positions were abolished, and they were separated from the service solely as a result of the contract with the Brotherhood, under the terms of which, certain functions being performed by the train porters were to be given to the brakemen. It was determined by the Carriers that it was economically unsound to supply both a porter and a brakeman on its trains, which theretofore had been served by a porter only.
The plaintiff insists that under the Railway Labor Act, he and other train porters who performed all the duties of brakemen are in fact trainmen, and should be in the same class as head-end brakemen; that the fact that they had been classified as "train porters" for purely functional purposes by the Carriers, does not establish their classification for purposes of representation, as provided by the Railway Labor Act, and, being trainmen, although excluded from membership in the Brotherhood, that it was the duty of the Brotherhood as the representative of the trainmen, to represent the interests of the train porters rather than to attempt to bring about their discharge. To sustain their position, they rely upon Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 in which the rights of a negro fireman were involved.
Plaintiff further contends that the contract entered into on March 7, 1946 between the Brotherhood of Railroad Trainmen and the Trustee was void as against public interest; that it was in violation of the constitutional rights of this plaintiff and those similarly situated; that it was the result of coercion and duress, having been forced upon the Carriers by the Brotherhood under threat of strike.
On the contrary, the defendants insist that there existed between the train porters, the Carriers and the Brotherhood a jurisdictional dispute, and that jurisdiction to determine that question is vested in the National Railroad Adjustment Board under the Railway Labor Act.
The contention of the plaintiff as to the classification of "train porters" and the duty of the Brotherhood to represent them, will be disposed of first.
The court has no jurisdiction to determine the question of whether or not the train porters should be classified as trainmen and represented by the Brotherhood except in so far as it is necessary to determine plaintiff's contention that the contract of March 7, 1946, is void.
"Craft" or "class" is not defined by the Railway Labor Act, and it becomes important in labor disputes only for the purpose of determining the right of representation of employees with their employers. 45 U.S.C.A. § 152, Ninth.[1] Under this section, exclusive jurisdiction is vested in the Mediation Board to determine the representative of, or the right to represent any craft or class, and the court has no jurisdiction to determine that question. General Committee v. Missouri-K.-T. R. Co., 320 U.S. 323, loc. cit. 337, 64 S.Ct. 146, 88 L.Ed. 76. No question ever arose between the employer and the train porters, or between the train porters and the Brotherhood prior to the agreement of March 7, 1946, as to the right to represent, or the obligation to represent the train porters, by the Brotherhood.
For more years than this plaintiff has been employed by the Carriers, train porters have been designated by the Carriers as a particular craft or class. This of course, was for purely functional reasons *701 so far as the Carriers were concerned, but such classification seemed to have been accepted by the porters for purposes of representation in their negotiations with Carriers.
Under Title 45 U.S.C.A. § 152, Fourth,[2] the carriers had no right to interfere with its employees in the matter of selecting their representative. For 25 years before the contract of March 7, 1946, was signed, the train porters had been organized into a separate class or classification for the purposes of representation, and at least 13 years before the Railway Labor Act of 1934 was passed. While it may be conceded that the formation of the different organizations of which the porters became members, including the Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Inc., were actuated by motives of necessity because negroes were not admitted to membership in the standard railroad organizations, whatever the reason may have been, they were classified as train porters, with distinctive duties and responsibilities and limitations as to promotion, and as such, had selected their representative and had negotiated numerous contracts with the carriers over a period of years.
I am unable to reconcile the facts in the Steele case supra, with the facts in this case. Steele was a fireman for the L. & N. and because of a discriminatory contract entered into between the L. & N. and the Brotherhood of Locomotive Firemen, Steele brought his action to protect his seniority rights. In that case, the court held that it was the duty of the Brotherhood of Locomotive Firemen to represent the minority as well as the majority, and that the negro fireman, who was ineligible to become a member of the Brotherhood of Locomotive Firemen, was entitled to all the benefits of the agreement entered into between the employer and the firemen, and that he could not be discriminated against. There was no question about Steele being a locomotive fireman. There could be no other classification for him because he performed no other duties than those of firing the engine, and he, like all other members of a minority group, was entitled to the benefits of whatever agreement the bargaining agency might derive from a contract. The Brotherhood had no more right to discriminate against him than any other person, white or black, who was employed as a fireman, but who was not a member of the Brotherhood, the bargaining agent. Had Steele been classified as a hostler or an engine wiper and belonged to some other labor organization, yet performing all the duties of a fireman, the holding might have been different, but Steele was never considered in any other class than that of the white employees who were members of the Brotherhood of Locomotive Firemen. Those are not the facts in this case.
The classification "Train porters," at least for functional purposes, was recognized by the Carriers and by all other persons in the railroad industry. The train porters themselves, so far as the record shows, had not disputed it. They had organized themselves into a labor organization and had selected that organization as their representative in all their dealings with the carriers. They had not requested the Brotherhood to represent them prior to the execution of the contract in controversy. If the porters stood here without representation, if they were members of no Labor organization and had sought to have the Brotherhood represent them, we might have a different question with respect to classification and representation, but those facts never existed in this case.
If the train porters, as a class, selected their own representative as contemplated by Title 45 U.S.C.A. § 152, Fourth, supra,[2] in contracting with their employer, then there would be no responsibility on the Brotherhood to represent them,a craft can have but one representativeVirginian R. v. Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789nor, was there any legal *702 obligation upon the Brotherhood to refrain from seeking by contract, to obtain for its members, those duties and functions which they insisted belonged to them. Certainly it cannot be claimed that this is an unusual situation or condition to be found in the labor movement. Although it often may seem unfair to weaker groups, it is almost a daily occurrence that one group seeks to acquire for itself certain functions which theretofore have been performed by another group.
As was said in General Committee, Etc. v. Missouri-K.-T. R. Co., 5 Cir., 132 F.2d 91, loc. cit. 94:
"The most bitter and perhaps the most numerous industrial disputes have come to be those in which classes of employees dispute with their employer and one another over who has the right to control a particular matter; the so-called jurisdictional disputes."
Mr. Eastman in testifying before the Committee of Congress at the hearings on the Railway Labor Act characterized such disputes as "one of the curses of the labor world."
If the train porters are dissatisfied with their classification and desire to have the Brotherhood represent them, they must submit that question to the Mediation Board, which has been given exclusive jurisdiction by the Congress to determine all disputed questions with respect to classification and representation. This court has no jurisdiction to determine such questions. Title 45 U.S.C.A. § 152 Ninth, supra; General Committee v. Missouri-K.-T. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L. Ed. 76.
The conclusion is inescapable that the contract would not have been entered into by the Trustee had it not been for the threat of strike. The economic results alone are convincing of that conclusion, because the members of the Brotherhood who, under the contract are to displace the porters, receive pay much in excess of that being paid the porters for performing less work.
As heretofore stated, the witness King, one of the officers of the carriers, who participated in the negotiations of the contract, stated that prior to March 7, 1946, the carriers desired to retain the services of the train porters; that it was only because of the threat of strike that the contract was entered into, and that it was because of the contract prohibiting the performance of certain duties by the train porters that their jobs were abolished, and they were separated from the service. Even though the contract may have been signed by the carrier as a result of a strike threat by the Brotherhood, if the Brotherhood owed the porters no duty to represent them, and had a right to contract with respect to functions to be performed by their own members, coercion would not void the contract. In view of the aforesaid, I am unable to find that the contract was void.
The next question concerns the contention of the carriers that the questions involved constitute a jurisdictional dispute and must be referred to the National Railroad Adjustment Board. Title 45 U.S.C.A. § 153, First (i)[3] again congress has conferred exclusive jurisdiction upon the National Railroad Adjustment Board to determine such questions, and this Court has no jurisdiction.
For a long period of time prior to the agreement of March 7, 1946, the performance of brakeman duties by train porters had been in dispute by the Brotherhood of Railroad Trainmen claiming for themselves the right to perform such functions. Whereas, on the contrary, the porters insisted, even as late as their attempted intervention before the Emergency Board, that they had a right to perform these duties. It therefore seems clear to me that there did exist a jurisdictional dispute; that the question must be submitted to the National Railroad Adjustment Board for *703 determination, and that this court is without jurisdiction. General Committee v. Missouri-K.-T. R. Co., 320 U.S. 323, 64 S. Ct. 146, 88 L.Ed. 76; General Committees, etc. v. Missouri-K.-T. R. Co., 5 Cir., 132 F. 2d 91; Order of Railroad Telegraphers et al. v. New Orleans T. & M. Ry. Co., 4 Cir., 156 F.2d 1.
If it were not for the rather unusual circumstances of this case, the court probably should dissolve the temporary injunction and retain jurisdiction pending disposition of the questions by the Mediation Board and by the National Railroad Adjustment Board. Order of Railroad Telegraphers et al. v. New Orleans T. & M. Ry. Co., 156 F.2d 1. But it seems to me that the unusual facts here do call for unusual procedure.
The Carriers insist that Title 45 U.S.C.A. § 152, Seventh,[4] does not apply because there was no change in the pay, rules or working conditions of the porters as embodied in agreements. The contract of February 3, 1944, between the Brotherhood of Trainmen, Brakemen, Switchmen, Porters, Firemen & Railway Employees, Incorporated, and the Carriers carried the thirty day clause conforming to Section 152, Seventh, supra.
Title 45 U.S.C.A. § 156[5] provides for at least thirty days notice of any intent to change agreements affecting pay, rules and working conditions. It is true carriers seek to discharge all of the porters rather than change the rates of pay or rules under which they work, but the abolishment of their jobs and their discharge clearly result from the execution of the contract of March 7, 1946, taking from the porters certain functions and duties and bestowing them elsewhere.
It is clear to me that prior to March 7, 1946, there did exist a jurisdictional dispute over the performance of the duties of brakemen by train porters, and that both under the contract between the train porters and the carriers, and under Section 152, Seventh, supra, and Section 156, supra, it was the duty of the carriers to give the statutory notice. This they did not do. Immediately following the signing of the contract of March 7, 1946, they notified all the porters of their separation from the service. Were it simply a labor dispute involving jurisdiction over certain functions or duties, probably a court of equity would be without jurisdiction to grant relief pending disposition of the question by the Administrative Boards.
Should the Mediation Board determine upon application that the porters have been improperly classified for purposes of representation, and that they should have been represented by the Brotherhood, or, if the National Railroad Adjustment Board should hold that under the contract with the Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Incorporated, or because of long standing custom the porters, as such, are entitled to perform the functions of brakemen, then clearly the plaintiff and his group will suffer irreparable injury through the loss of their jobs, for which they have no administrative remedy and no adequate remedy at law.
*704 It is my opinion that the restraining order should be continued pending determination by the National Railroad Adjustment Board of the question of jurisdiction as to the performance of the functions of brakemen by the porters, and for a determination of the question of the classification and right or duty of representation by the Mediation Board, or for a reasonable time within which the plaintiff through his labor organization representative may invoke the jurisdiction of those Boards. It is so ordered.
Findings of Fact, Conclusions of Law and Decree may be submitted in accordance herewith.
NOTES
[1] "Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its service, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. * * *"
[2] "Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. * * *"
[3] "(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; * * *."
[4] "Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."
[5] "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."