## BROTHERHOOD OF RAILROAD TRAINMEN ET AL. *v.* HOWARD ET AL.

No. 458.  Argued April 22, 1952.—Decided June 9, 1952.

*Charles R. Judge* argued the cause for petitioners. With him on the brief was *Wayland K. Sullivan.*

*Joseph C. Waddy* and *Victor Packman* argued the cause for Howard, respondent. With them on the brief was *Henry D. Espy.*

*Eugene G. Nahler, James L. Homire, Cornelius H. Skinker, Jr.* and *Alvin J. Baumann* submitted on brief for the St. Louis-San Francisco Railway Co., respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case raises questions concerning the power of courts to protect Negro railroad employees from loss of their jobs under compulsion of a bargaining agreement which, to avoid a strike, the railroad made with an exclusively white man's union. Respondent Simon Howard, a Frisco [1] train employee for nearly forty years,

---

[1] St. Louis-San Francisco Railway Company and its subsidiary St. Louis-San Francisco & Texas Railway Company.

brought this action on behalf of himself and other colored employees similarly situated.

In summary the complaint alleged: Negro employees such as respondent constituted a group called "train porters" although they actually performed all the duties of white "brakemen"; the Brotherhood of Railroad Trainmen, bargaining representative of "brakemen" under the Railway Labor Act,[2] had for years used its influence in an attempt to eliminate Negro trainmen and get their jobs for white men who, unlike colored "train porters," were or could be members of the Brotherhood; on March 7, 1946, the Brotherhood finally forced the Frisco to agree to discharge the colored "train porters" and fill their jobs with white men who, under the agreement, would do less work but get more pay. The complaint charged that the Brotherhood's "discriminatory action" violated the train porters' rights under the Railway Labor Act and under the Constitution; that the agreement was void because against public policy, prejudicial to the public interest, and designed to deprive Negro trainmen of their right to earn a livelihood because of their race or color. The prayers were that the court adjudge and decree that the contract was void and unenforceable for the reasons stated; that the Railroad be "enjoined from discontinuing the jobs known as Train Porters" and "from hiring white Brakemen to replace or displace plaintiff and other Train Porters as planned in accordance with said agreement."

The facts as found by the District Court, affirmed with emphasis by the Court of Appeals, substantially established the truth of the complaint's material allegations. These facts showed that the Negro train porters had for a great many years served the Railroad with loyalty, integrity and efficiency; that "train porters" do all the work

---

[2] 44 Stat. 577, as amended, 48 Stat. 1185, 45 U. S. C. §§ 151 *et seq.*

of brakemen;[3] that the Government administrator of railroads during World War I had classified them as brakemen and had required that they be paid just like white brakemen; that when the railroads went back to their owners, they redesignated these colored brakemen as "train porters," "left their duties untouched," and forced them to accept wages far below those of white "brakemen" who were Brotherhood members; that for more than a quarter of a century the Brotherhood and other exclusively white rail unions had continually carried on a program of aggressive hostility to employment of Negroes for train, engine and yard service; that the agreement of March 7, 1946, here under attack, provides that train porters shall no longer do any work "generally recognized as brakeman's duties"; that while this agreement did not in express words compel discharge of "train porters," the economic unsoundness of keeping them after transfer of their "brakemen" functions made complete abolition of the "train porter" group inevitable; that two days after "the Carriers reluctantly, and as a result of the strike threats" signed the agreement, they notified train porters that "Under this agreement we will, effective April 1, 1946, discontinue all train porter positions." Accordingly, respondent Howard, and others, were personally notified to turn in their switch keys, lanterns, markers and other brakemen's equipment, and notices of job vacancies were posted to be bid in by white brakemen only.

---

[3] In addition to doing all the work done by ordinary brakemen, train porters have been required to sweep the coaches and assist passengers to get on and off the trains. As the Court of Appeals noted, "These aisle-sweeping and passenger-assisting tasks, however, are simply minor and incidental, occupying only, as the record shows, approximately five per cent of a train porter's time." 191 F. 2d 442, 444.

The District Court held that the complaint raised questions which Congress by the Railway Labor Act had made subject to the exclusive jurisdiction of the National Mediation Board and the National Railroad Adjustment Board. 72 F. Supp. 695. The Court of Appeals reversed this holding.[4] It held that the agreement, as construed and acted upon by the Railroad, was an "attempted predatory appropriation" of the "train porters'" jobs, and was to this extent illegal and unenforceable. It therefore ordered that the Railroad must keep the "train porters" as employees; it permitted the Railroad and the Brotherhood to treat the contract as valid on condition that the Railroad would recognize the colored "train porters" as members of the craft of "brakemen" and that the Brotherhood would fairly represent them as such. 191 F. 2d 442. We granted certiorari. 342 U. S. 940.

While different in some respects, the basic pattern of racial discrimination in this case is much the same as that we had to consider in *Steele v. L. & N. R. Co.*, 323 U. S. 192. In this case, as was charged in the *Steele* case, a Brotherhood acting as a bargaining agent under the Railway Labor Act has been hostile to Negro employees, has discriminated against them, and has forced the Railroad to make a contract which would help Brotherhood members take over the jobs of the colored "train porters."

There is a difference in the circumstances of the two cases, however, which it is contended requires us to deny the judicial remedy here that was accorded in the *Steele*

---

[4] One part of the District Court's order was affirmed. The Court of Appeals held that the District Court had properly enjoined the Railroad from abolishing the position of "train porters" under the notices given, on the ground that these notices were insufficient to meet the requirements of § 2, Seventh, and § 6 of the Railway Labor Act. The view we take makes it unnecessary for us to consider this question.

case. That difference is this: Steele was admittedly a locomotive fireman although not a member of the Brotherhood of Locomotive Firemen and Enginemen which under the Railway Labor Act was the exclusive bargaining representative of the entire craft of firemen. We held that the language of the Act imposed a duty on the craft bargaining representative to exercise the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against any of them. Failure to exercise this duty was held to give rise to a cause of action under the Act. In this case, unlike the *Steele* case, the colored employees have for many years been treated by the carriers and the Brotherhood as a separate class for representation purposes and have in fact been represented by another union of their own choosing. Since the Brotherhood has discriminated against "train porters" instead of minority members of its own "craft," it is argued that the Brotherhood owed no duty at all to refrain from using its statutory bargaining power so as to abolish the jobs of the colored porters and drive them from the railroads. We think this argument is unsound and that the opinion in the *Steele* case points to a breach of statutory duty by this Brotherhood.

As previously noted, these train porters are threatened with loss of their jobs because they are not white and for no other reason. The job they did hold under its old name would be abolished by the agreement; their color alone would disqualify them for the old job under its new name. The end result of these transactions is not in doubt; for precisely the same reasons as in the *Steele* case "discriminations based on race alone are obviously irrelevant and invidious. Congress plainly did not undertake to authorize the bargaining representative to make such discriminations." *Steele* v. *L. & N. R. Co., supra,* at 203, and cases there cited. Cf. *Shelley*

v. *Kraemer*, 334 U. S. 1. The Federal Act thus prohibits bargaining agents it authorizes from using their position and power to destroy colored workers' jobs in order to bestow them on white workers. And courts can protect those threatened by such an unlawful use of power granted by a federal act.

Here, as in the *Steele* case, colored workers must look to a judicial remedy to prevent the sacrifice or obliteration of their rights under the Act. For no adequate administrative remedy can be afforded by the National Railroad Adjustment or Mediation Board. The claims here cannot be resolved by interpretation of a bargaining agreement so as to give jurisdiction to the Adjustment Board under our holding in *Slocum* v. *Delaware, L. & W. R. Co.*, 339 U. S. 239. This dispute involves the validity of the contract, not its meaning. Nor does the dispute hinge on the proper craft classification of the porters so as to call for settlement by the National Mediation Board under our holding in *Switchmen's Union* v. *National Mediation Board*, 320 U. S. 297. For the contention here with which we agree is that the racial discrimination practiced is unlawful, whether colored employees are classified as "train porters," "brakemen," or something else. Our conclusion is that the District Court has jurisdiction and power to issue necessary injunctive orders notwithstanding the provisions of the Norris-LaGuardia Act.[5] We need add nothing to what was said about inapplicability of that Act in the *Steele* case and in *Graham* v. *Brotherhood of Firemen*, 338 U. S. 232, 239–240.

Bargaining agents who enjoy the advantages of the Railway Labor Act's provisions must execute their trust without lawless invasions of the rights of other workers. We agree with the Court of Appeals that the District

---

[5] 47 Stat. 70, 29 U. S. C. §§ 101 *et seq.*

Court had jurisdiction to protect these workers from the racial discrimination practiced against them. On remand, the District Court should permanently enjoin the Railroad and the Brotherhood from use of the contract or any other similar discriminatory bargaining device to oust the train porters from their jobs. In fashioning its decree the District Court is left free to consider what provisions are necessary to afford these employees full protection from future discriminatory practices of the Brotherhood. However, in drawing its decree, the District Court must bear in mind that *disputed* questions of reclassification of the craft of "train porters" are committed by the Railway Labor Act to the National Mediation Board. *Switchmen's Union* v. *National Mediation Board, supra.*

The judgment of the Court of Appeals reversing that of the District Court is affirmed, and the cause is remanded to the District Court for further proceedings in accordance with this opinion.

*It is so ordered.*

MR. JUSTICE MINTON, with whom THE CHIEF JUSTICE and MR. JUSTICE REED join, dissenting.

The right of the Brotherhood to represent railroad employees existed before the Railway Labor Act was passed. The Act simply protects the employees when this right of representation is exercised. If a labor organization is designated by a majority of the employees in a craft or class as bargaining representative for that craft or class and is so recognized by the carrier, that labor organization has a duty to represent in good faith all workers of the craft. *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, 202. In the *Steele* case, the complainant was a locomotive fireman; his duties were wholly those of a fireman. The Brotherhood in that case represented the "firemen's craft," but would not admit Steele as a mem-

ber because he was a Negro. As the legal representative of his craft of firemen, the Brotherhood made a contract with the carrier that discriminated against him because of his race. This Court held the contract invalid. It would have been the same if the Brotherhood had discriminated against him on some other ground, unrelated to race. It was the Brotherhood's duty "to act on behalf of all the employees which, by virtue of the statute, it undertakes to represent." *Steele, supra,* at 199.

In the instant case the Brotherhood has never purported to represent the train porters. The train porters have never requested that the Brotherhood represent them. Classification of the job of "train porter" was established more than forty years ago and has never been disputed. At that time, the principal duties of the train porters were cleaning the cars, assisting the passengers, and helping to load and unload baggage; only a small part of the duties were those of brakemen, who were required to have higher educational qualifications. As early as 1921, the train porters organized a separate bargaining unit through which they have continuously bargained with the carrier here involved; they now have an existing contract with this carrier. Although the carriers gradually imposed upon the train porters more of the duties of brakemen until today most of their duties are those of brakemen, they have never been classified as brakemen.

The majority does not say that the train porters are brakemen and therefore the Brotherhood must represent them fairly, as was held in *Steele.* Whether they belong to the Brotherhood is not determinative of the latter's duties of representation, if it represents the craft of brakemen and if the train porters are brakemen. Steele was not a member of the Brotherhood of Locomotive Firemen and Enginemen and could not be because of race—the same reason that the train porters cannot belong to the

Brotherhood of Trainmen. But Steele was a fireman, while the train porters are not brakemen.

The Brotherhood stoutly opposes the contention that it is the representative of the train porters. For the Court so to hold would be to fly in the face of the statute (45 U. S. C. § 152, Ninth) and the holding of this Court in *General Committee* v. *Missouri-K.-T. R. Co.,* 320 U. S. 323, 334–336.* The majority avoids the dispute in terms but embraces it in fact by saying it is passing on the validity of the contract. If this is true, it is done at the instance of persons for whom the Brotherhood was not contracting and was under no duty to contract. The train porters had a duly elected bargaining representative, which fact operated to exclude the Brotherhood from representing the craft. *Steele, supra,* at 200; *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 548.

The majority reaches out to invalidate the contract, not because the train porters are brakemen entitled to

---

*"Nor does § 2, Second make justiciable what otherwise is not. It provides that 'All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.' As we have already pointed out, § 2, Ninth, after providing for a certification by the Mediation Board of the particular craft or class representative, states that 'the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act.'

.        .        .        .        .

"It is clear from the legislative history of § 2, Ninth that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees. H. Rep. No. 1944, *supra,* p. 2; S. Rep. No. 1065, 73d Cong., 2d Sess., p. 3. However wide may be the range of jurisdictional disputes embraced within § 2, Ninth, Congress did not select the courts to resolve them."

fair representation by the Brotherhood, but because they are Negroes who were discriminated against by the carrier at the behest of the Brotherhood. I do not understand that private parties such as the carrier and the Brotherhood may not discriminate on the ground of race. Neither a state government nor the Federal Government may do so, but I know of no applicable federal law which says that private parties may not. That is the whole problem underlying the proposed Federal Fair Employment Practices Code. Of course, this Court by sheer power can say this case is *Steele,* or even lay down a code of fair employment practices. But sheer power is not a substitute for legality. I do not have to agree with the discrimination here indulged in to question the legality of today's decision.

I think there was a dispute here between employees of the carrier as to whether the Brotherhood was the representative of the train porters, and that this is a matter to be resolved by the National Mediation Board, not the courts. I would remand this case to the District Court to be dismissed as nonjusticiable.