229 F.2d 648
 9 Fair Empl.Prac.Cas. (BNA) 430, 1 Empl. Prac.
Dec. P 9644
CENTRAL OF GEORGIA RAILWAY COMPANY and Brotherhood of
Railroad Trainmen, Appellants & Cross-Appellees,
v.
Odell JONES, Dock Rutledge, A. C. Cain, and Major Threat et
al., for and onbehalf of themselves and others
similarly situated, Appellees &
Cross-Appellants.
Odell JONES, Dock Rutledge, A. C. Cain, and Major Threat et
al., for and onbehalf of themselves and others
similarly situated, Appellees & Cross-Appellants,
v.
CENTRAL OF GEORGIA RAILWAY COMPANY and Brotherhood of
Railroad Trainmen, Appellants & Cross-Appellees.
 No. 15451.
 United States Court of Appeals Fifth Circuit.
 Jan. 31, 1956.
Rehearing Denied March 9, 1956.
 
 W. H. Sadler, Jr., J. K. Jackson, Al G. Rives, Birmingham, Ala., John B. Miller, Savannah, Ga., Jackson, Rives, Pettus & Peterson, Birmingham, Ala., Wayland K. Sullivan, Cleveland, Ohio, of counsel, for appellants.
 Jerome A. Cooper, Birmingham, Ala., William E. Mitch, Hugo L. Black, Jr., Cooper, Mitch & Black, Birmingham, Ala., for appellees.
 Before RIVES, JONES and BROWN, Circuit Judges.
 PER CURIAM.
 
 
 1
 In an agreement made in 1952 between the appellants, Central of Georgia Railway Company and Brotherhood of Railroad Trainmen, a provision having its origin in a contract made more than thirty years before was included which prohibited negroes from being used in certain positions in the train service of the Railway. The appellees, Negro employees of the Railway and members of the Brotherhood, brought a class suit in which they alleged discrimination on account of race, and sought an injunction against the enforcement of the contract provision and the practices it authorized. Damages were also asked. The District Court granted the relief sought but, invoking the Alabama Statute of Limitations, it allowed damages only for the period of one year prior to the commencement of suit. The Railway and the Brotherhood appealed. The employees took a cross-appeal asserting that the one-year limitation period was inapplicable. The District Court was right. The law on the substantive question is well established by Steele v. Louisville & N.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Graham v. Brotherhood, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Rolax v. Atlantic Coast Line R. Co., 4 Cir., 186 F.2d 473; Brotherhood of Locomotive Firemen and Enginemen v. Mitchell, 5 Cir., 190 F.2d 308. See also Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, reversing 5 Cir., 223 F.2d 739. As to the question of the time for which damages may be recovered, we approve the limit of one year as fixed by the District Court, and this whether under the statute of limitations or the equitable doctrine of laches. See Brotherhood of Locomotive Firemen and Enginemen v. Mitchell, supra; Gardner v. Panama R. Co., 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31.
 
 The judgment is
 
 2
 Affirmed.
 
 
 3
 BROWN, Circuit Judge (dissenting in part).
 
 
 4
 I believe that the relief, in this form, and at this time, against the Railway was erroneous. I would therefore reverse as to it.
 
 
 5
 I accept, however, without restraint or reservation all that is expressed in the District Court's opinion and findings and implied in this Court's per curiam opinion concerning the obvious knowledge by the Railway that the contract[1] and practices were in violation[2] of law and had to be terminated by declaring the contract void as to the future. In this way, following the Steele mandate, the Railway will cease to enjoy any benefit under it.
 
 
 6
 But the relief[3] did not stop there. Here, the Railway is required to pay (through the incidental money award) vicarious wages back to July 29, 1953, and affirmatively afford equal opportunity for actual employment in each of these jobs for the future. As to the past, the Railway is thus required to pay damages; as to the future, it is compelled to make contracts of employment.
 
 
 7
 There must be some legal warrant for each of these visitations.
 
 
 8
 What duty did the Railway violate? The Brotherhood had, to be sure, the profound obligation fully and earnestly to bargain to prevent, and, where necessary, remove, discriminations. This is found in the unique position of the Brotherhood under the Railway Labor Act to bargain for all. But no such duty rests upon the Railway. It has, first, no right whatever to make contracts direct with its employees or groups of them. It is compelled, Sec. 6, Railway Labor Act, 45 U.S.C.A. § 156, to deal with the statutory bargaining representative (Brotherhood) alone.
 
 
 9
 It could, of course, under Sec. 6 have given notice that the contract should be amended to terminate the discrimination, and had it done so, the Brotherhood presumably would have been obliged to negotiate in good faith on this issue up through the mediation provisions, 45 U.S.C.A. §§ 154, 155, 160.
 
 
 10
 But the question is: was it bound to do so? To hold that it was is to say that it was on the Railway to make certain that the Brotherhood was fulfilling its statutory obligations. It is to say that in the negotiation process, each proposal must be viewed by the adversary not alone in terms of its own self-interest, but equally in terms of whether the proposing adversary has complied fully with the trust which it owes, not to employer, but to union members and employees affected. It is the genius of the bargaining process that, akin to our Anglo-American adjudicatory mechanism of unfettered advocacy, the safest, surest and best result is achieved when each side, in open, vigorous, unapologetic contention sets forth its claims and demands without stint. The process weakens, it becomes suspect, it invites the necessary intrusion of outside (governmental or otherwise) umpires as enlightened self-interest ceases to be the sole guide. It cannot be that the Railroad shall police the Brotherhood's performance.
 
 
 11
 So while the Railroad knew all the while that the Brotherhood was not fulfilling its duties, it was not up to it either to demand a change or prick the conscience of its adversary.
 
 
 12
 If it had no duty to make its adversary bargain better, on what ground can it be made to pay for that which such energetic, conscientious bargaining might have produced?
 
 
 13
 Nor, it seems to me, does the grant of future relief withstand scrutiny any better. It is, first, of course, a complete by-pass of the whole process of the quasi-voluntary bargaining-mediation mechanism of the Railway Labor Act. Both Brotherhood and employer are left out. The District Judge, as a chancellor, acquires a power to do what no Mediator, Adjustment Board or Emergency Fact Finder is empowered to do-- force a labor contract. Indeed, he does it with no semblance of negotiation or mediation-- he does it in spite of; he does it over the protest of all but one segment.
 
 
 14
 It is to infuse with adequate effectiveness by a judicial decree a policy which Congress has repeatedly declined to create by legislation. It is to force an employer to hire persons of a given race for given jobs. That is the aim of proposed Fair Employment Practice Code. Until it is enacted, it is not for government through its judicial arm, or otherwise, to say to this employer: these must be hired. See, Mr. Justice Minton's dissent in Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 775, 778, 72 S.Ct. 1022, 96 L.Ed. 1283, 1289, 1291.
 
 
 15
 As far as Government can go, is to release the victims of this discriminatory contract from its restraining burden and impose on their vicarious agent the heavy duty of energetic bargaining for all, or even more than what, the Judge gave them. It may be, or we can even assume that it is bound to result, that when the Brotherhood, under the positive mandate to negotiate diligently, marshals all of the tremendous economic pressures, the threats of strikes, and the other forces open to it, it can compel the Railway to open up these very same jobs to equal competition. But if that occurs, it is the result of the bargaining process which Congress has so long nurtured as the basic weapon of the arsenal for industrial peace.
 
 
 16
 There is a vital distinction between our case and that of Steele, Rolax, and the others: in each of them, the discriminatory contract altered a pre-existing status-- a status previously accorded to the affected Negroes by voluntary bargaining. When the offending contract was removed by equity decree, the parties were restored to their former position in which Negroes could perform the jobs (firemen) for which the Railroads had long hired them. But here, once the 1952 contract is discarded as void (as it should be) nothing remains-- no former practice-- no former implied agreement to accord any of these jobs to Negroes. The slate is clean. The way is open for the future, but there is nothing in the past to revive as the basis for an interim arrangement.
 
 
 17
 It is plain from my joining in the Court's opinion that I do not accept the contention of Brotherhood or Railway that Steele forbids discriminatory future changes alone. The antiquity of the discrimination here, its perpetuation in the contract through successive renewals gives neither the right to demand its continuation. But when it is dissipated, it is not for a Court by coercive decree to fill the void. The contract is removed as an impediment to the statutory scheme. That scheme revives the process of bargaining at that point, and it is for Brotherhood and Railway, not the Court, to make the new agreement.
 
 
 18
 I therefore respectfully dissent to this extent.
 
 
 19
 Rehearing denied: BROWN, Circuit Judge, dissenting.
 
 
 
 [1]
 Apparently as early as 1919, the contract was stated in the same terms as in the first overall collective bargaining agreement of January 1, 1927 between Central of Georgia Railway Company and the Brotherhood of Railroad Trainmen, and readopted in successive contracts without negotiation of any kind concerning this issue, down to and including the contract 'Schedule of Wages, Rules and Regulations Governing Its Trainmen, Twelfth Edition, effective August 1, 1952,' signed by Brotherhood and Railway:
 'Article 26.
 'Seniority and Filling Vacancies
 '(a) When train or yard forces are reduced the men involved will be displaced in the order of their seniority, regardless of color. When a vacancy occurs, or new runs are created, the senior man will have preference in choice of run or vacancy, either as flagman, baggageman, brakeman, or switchman, except that negroes are not to be used as conductors, flagmen, baggagemen or yard conductors.
 '(b) Negroes are not to be used as flagmen, except those in that service August 27, 1919, may be retained therein with their seniority rights. White men are not to be used as porters; no porter to have any trainmen's rights except where he may have established same by three months continuously in freight service.'
 The written contract thus covers specifically the position of the Negro in road service, and, in part at least, as switchmen in yard service. The contract status is not so precise or categorical as to 'lister switchmen' but there is no difference in the nature of the discrimination or the available remedies as to this category.
 
 
 [2]
 The court found as a fact that by the contract and the long continued practices of Brotherhood and Railway, Negroes, otherwise fully qualified to perform the tasks, were unlawfully denied the right to compete for work as flagmen and baggagemen in road service and lister switchmen in yard service
 Brakemen work at the front of the train; they ascend the seniority ladder to (1) flagmen, (2) baggagemen, and (3) conductors. Flagmen work at the rear of a train and understudy conductors. Baggagemen work in the mail car. A white man retains full seniority on each lower job as he progresses up the ladder.
 In yard service Negroes and whites compete equally for regular switchman's work. As more white men found yard service attractive, the practice developed of listing on the bulletin (i.e., placing up for bid) switching jobs as 'booking and flagging,' or as jobs called for switchmen qualified in 'booking and flagging,' sometimes called 'lister switchmen' from the fact that such employees perform certain clerical work, keep simple books, lists of cars and records formerly done principally by yard conductors (foremen). The evidence, showed, and the trial court found, that Negroes frequently perform these simple responsibilities in emergencies, occasional holidays when white men are not available, and are in fact fully qualified. The Railway agrees since it contends that Negroes are eligible now and if denied such work, it is inadvertent. The Brotherhood is more fluid on the point, but its attack by specification and brief on lister switchmen is the legal one that this is a Railway Adjustment Board controversy, which has no real basis.
 We are in agreement that there can be no real dispute about discrimination in fact on account of race. While Negroes and whites compete equally for brakemen, and a white brakeman of less seniority cannot 'roll' (displace) a Negro brakeman with greater seniority, it is entirely possible and a common occurrence for a Negro brakeman to be 'rolled' by a white brakeman of greater seniority at the same time a white man, junior to the Negro, is serving on the same train as flagman or baggageman. The result is the same where new jobs as flagman or baggageman open up or persons are working the extra board. In both, the Negro competes only for brakeman while white men junior to him monopolize the other two.
 
 
 [3]
 The Court enjoined Brotherhood and Railway from enforcing the 1952 contract or operating practices which denied Negroes the right to compete (and train) for these jobs; and affirmatively required each to grant the same seniority rights, training privileges, assignments and opportunities to these jobs as white persons of similar continuous service would enjoy. In addition, as 'incidental damages', it awarded the amounts representing the difference between plaintiffs' actual earnings and the respective amounts they would have earned had each of them been assigned jobs and permitted opportunities to train therefor upon the basis of continuous service seniority, together with amounts equivalent to any other losses proximately caused