Merle **PALMIERI**, Plaintiff,

v.

**UNITED STEELWORKERS OF AMER- ICA and the Conemaugh and Black Lick Railroad Company, a corporation, Defendants.**

**Civ. A. No. 66–702.**

United States District Court
W. D. Pennsylvania.

June 28, 1967.

**6**

William B. Dixon, for plaintiff.

Nathan Lipson, Pittsburgh, Pa., for defendant Union.

Joseph A. Katarincic, Pittsburgh, Pa., for defendant railroad.

## OPINION

ROSENBERG, District Judge.

This matter is here on motions by both defendants for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The plaintiff brought this action upon a claim of alleged discriminatory discharge in violation of a right arising out of the Railway Labor Act (45 U.S.C. § 151 et seq.). He contends that he was discriminatorily discharged by the railroad and that the Union and the railroad discriminatorily refused to process the plaintiff's grievance.

This action was filed following a dismissal of an earlier action by this plaintiff against the same defendants at Civil Action 66–123. In the earlier action, a motion to dismiss the complaint was made by the defendants on the grounds that it lacked judicial diversity requirements. After argument the hearing judge allowed the plaintiff ten days to amend. This the plaintiff failed to do and the action was thereafter dismissed.

The plaintiff in the complaint here filed claims the right to an action based upon the Railway Labor Act and essentially charges both the defendants with discrimination against him, and failure to protect the plaintiff as one of the members of the defendant Union and as the employee of the other defendant.[1]

In the complaint the charge is made that a Collective Bargaining Agreement was entered into between both defendants on August 14, 1962; that the railroad failed to honor the plaintiff's seniority rights after placing him on furlough status; that some mixup arose as to the last known address of the plaintiff; that the plaintiff attempted to secure representation from the defendant union in grievance procedures by which the plaintiff's rights would be protected and adjudicated; that both defendants discriminatorily refused to process his grievance either severally or jointly; that this re-

---

1. Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, 1944, determined that an employee had a remedy under the Railway Labor Act "for breach of the statutory duty of the bargaining representative to represent and act for the members of a craft."

sulted in immediate loss of work and seniority rights of the plaintiff to which he was entitled; and that the plaintiff was in need of equitable relief and desires, after final hearing, such other relief as would appear proper.

■ It will not be necessary here to discuss any of the specific provisions of the Railway Labor Act. Suffice to say that judicial decisions have determined that under the Act a federal court has jurisdiction to entertain an action by an employee against his union and his employer based upon discriminatory treatment. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80, 1957; Ford Motor Company v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048, 1952; Brotherhood of Railway Firemen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283, 1952; Steele v. Louisville & Nashville R. Co., supra; Gainey v. Brotherhood of Railway & Steamship Clerks, Inc., 313 F. 2d 318, C.A.3, 1963; Hardcastle v. Western Greyhound Lines, 303 F.2d 182, C.A. 9, 1962; Cunningham v. Erie R. R. Co., 266 F.2d 411, C.A.2, 1959; Mount v. Grand Int'l Brotherhood of Locomotive Engineers, 226 F.2d 604, C.A.6, 1955, cert. den. 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed. 839, 1956.

■■ However, to support an action based upon discriminatory conduct, the plaintiff must show bad faith or improper motivation on the part of the defendants. As stated in the Gainey case, supra, 313 F.2d at page 322, the discrimination must be "hostile":

"The Steele rule is that a union which possesses the power to act for all employees of a bargaining unit has the corresponding duty to represent all the members of the unit fairly, impartially and in good faith, without 'hostile discrimination' against any of them. * * * In order to come within its ambit, the complaint before us must have more than conclusory statements alleging discrimination. In particular plaintiffs must make a showing that the action or inaction of the statutory representative complained of was motivated by bad faith, for the gravamen of the rule is 'hostile discrimination'. An allegation that certain conduct of the Brotherhood or a condition permitted to exist by it is 'invidious' and 'discriminatory', without a concomitant identification of lack of good faith, will not set forth a claim sufficient to call for the use of the Steele doctrine."

■ The Gainey case involved a motion to dismiss the complaint. The instant motions for summary judgment under Federal Rule of Civil Procedure 56 are of broader scope and in the determinations thereof reference may be made to depositions, affidavits, admissions and answers to interrogatories of record.

Under the Gainey case then, it would appear to me that a motion to dismiss could find sufficiency in attacking the complaint alone, without necessity for support in any depositions or the like. Thus we examine the complaint and find that it makes but a simple statement in the second part of paragraph 1, that jurisdiction is based upon "the provisions of the Railway Labor Act requiring both union representatives and employers to provide protection to its members and employees without discrimination to any one group or person." This paragraph further explains that the plaintiff seeks injunctive relief and damages resulting from a discriminatory discharge of the plaintiff.

In the fourth paragraph it is stated that the plaintiff attempted to secure representation from the defendant union in the grievance procedure, but both defendants discriminatorily refused to process his grievance or to take any affirmative action on his case. This is the only averment made to support the essential element of this action, i. e., that the defendants were motivated by bad faith and were guilty of hostile discrimination against him.

However, it is not necessary to make a determination on the lack of these necessary elements in the complaint, for in this record there are statements by the

plaintiff which indicate that he possesses no facts which will indeed supply the necessary elements to make out his case. In fact his statements support the defendant's contentions.

The record shows that the plaintiff was hired by the defendant railroad on January 26, 1960; on June 1, 1960, he was furloughed; his residence at that time was in Johnstown, Pennsylvania; subsequently he moved to Oakland Township, Pennsylvania; on September 3, 1964, the railroad recalled the plaintiff by letter directed to the Johnstown address; the letter was returned and marked "Gave no address"; twenty days after the letter of recall, the railroad sent another letter to the plaintiff advising him that he was terminated for failing to return to service, which letter was returned and marked as was the first letter; on November 11, 1964, the plaintiff contacted the railroad and was hired as a new employee in a probationary capacity; he then contacted the Union for aid in reinstatement as an old employee; there is disagreement as to whether a grievance was actually filed with the Union; however, the Union representatives took the complaint to the company and considerable discussion occurred; finally, after much discussion, the plaintiff accepted the Union representatives' advice to continue on with the job as a new employee and to continue conciliatory action, although this was unsuccessful, and not to process a grievance; and on December 30, 1964, within the probationary period, he was discharged as an unsatisfactory employee.[2]

The complaint evidently for the first time thereafter arose when the plaintiff was unsuccessful in his action against the company for wrongful dismissal. The plaintiff's complaint then is directed to alleged discriminatory conduct of the defendants surrounding the recall of September 1964 and the status of employment in November 1964.

The plaintiff's deposition, taken on October 17, 1966, does not present any factual substance to support his position that "both defendants discriminatorily refused to process plaintiff's grievance and severally and jointly refused to take any affirmative action on his case." An attempt was there made to elicit specific facts in support of the plaintiff's claim of discriminatory treatment. Reference to the deposition is necessary. At pages 104–105:

"Q. I think, Mr. Palmieri, you started to suggest a while ago that you could understand why Hagans and Louditch[3] were acting as they did. I think you said they were trying to resolve it peacefully and try to work it out peacefully?

A. Yes. I have no complaint on that; I felt it was the best idea. * * At that time I thought it was the best idea, because it was his theory that had I continued employment there with the company, that I would be—in other words, in his words was this: 'Mr. Palmieri, I'm not going to be working with these people, you are. Let me do the best thing by getting this resolved without any trouble and get you back on the job in the good standing of the company and we can get this thing so you can live with them once you're back.' "

To the same effect, at pages 85–86:

"A. * * * In other words, it was explained to me by Mr. Louditch in such words as this: He says, 'Now, Merle, we are going to try to resolve this problem with the company without creating a big

2. The action here is for reinstatement to a former seniority level. The plaintiff, according to page 6 of the defendant railroad's brief, went to work with the parent corporation, Bethlehem Steel Co., with which company he is currently employed, and according to plaintiff's counsel continues in such employment as a member of the defendant Union.

3. Hagans and Louditch are Union representatives.

hassle over it, if we can,' and he said, 'I think we can;' this would be the wisest move on my part, being what I would be working with them there; I would have to live with these people—with the company; therefore, he says —he thought that even if it took a little time, he could get the company negotiating it without a big deal over it.

Q. And that made sense to you at the time?

A. It did, because—I mean, I felt he was right, because I'm going there to work for the company and I don't want to fight with these people; I want to make a living with them. That is what made sense to me, and I bought it."

At page 102:

"Q. So, as far as you are concerned, you were looking to the union to vindicate your wrong?

A. Yes, I was. I took those fellows at the time as being honest men. I felt that they were going to do what they said they were going to do. I know that I would have if things would have been turned around; that is the way I would look at it."

At pages 63–64:

"Q. So, would it be fair to say that at the time you filed the first lawsuit, you knew of no facts that would indicate that the union was discriminating against you; is that true?

A. I had my ideas, but no facts.

Q. You had no facts at that time?

A. That's right. I had my ideas, but no facts.

Q. Then, you are saying that the only basis for you filing the second lawsuit alleging discrimination is what happened between the time you filed the first lawsuit and filed the second lawsuit; is that true?

A. That is true."

At page 98:

"Q. Pardon the interruption, but you are going beyond answering my question. I am merely asking whether your relations with him were fairly cordial and your answer is that you are getting along?

A. Yes.

Q. So you do not know any particular reasons why Mr. Hagans or Mr. Louditch should desire to hurt you, any particular reason why they would want to hurt you?

A. I wouldn't know that. I couldn't tell you that."

Concerning the alleged discrimination by the defendant railroad, the plaintiff stated, at page 103:

"Q. I want to know if you know whether or not the railroad ever refused to process your grievance if submitted by the union? It is a simple question.

A. I don't think that they would have refused had it been presented. That is what I said.

Q. They did not refuse to process it, as far as you know, I take it?

A. Well, they didn't want to accept it; they didn't want to.

Q. I said if submitted. Do you know if the union ever submitted it to the company?

A. No.

Q. Well, you do not know if the company would refuse to process it or not?

A. I said I don't think they would have, had it been presented.

Q. Why are you suing the company then?"

(This question was not answered)

At pages 103–104:

"Q. As far as you know, the company has done no wrong to you under the collective bargaining

agreement, as far as a grievance is concerned?

A. As far as I know, the company, I feel has a grievance procedure now because it had never been presented—the procedure. It doesn't make sense."

At pages 102–103:

"Q. You have no reason to think, do you, that the company ever turned down a grievance on your behalf that was presented by the union? Do you have reason to think they refused to process it?

A. I will answer that question in this way: I believe that at this point—at this point, I believe that had this grievance been properly presented, that—I might be stretching my neck a little bit —but I do think that the company would have accepted it: that is what I think now. Now, I am elaborating here. I have no way of being sure about it.

Q. You have no reason to think that this company, as a company, was going to even refuse to consider your grievance if presented, do you?

A. Well, as I say—I answered that question, I think, when I told you I think that if properly—that instead of playing games with them—in other words, as Hagans and Louditch—of course, I can see their point too; they were trying to resolve it peacefully."

The plaintiff makes no averment that other employees charged with similar violations of company rules on furlough and recall procedures were treated in a different manner than he was treated by the railroad company. The necessary basis for this action is thus lacking a factual averment and a deposable support. From all that appears in this record, the Union did represent the plaintiff amicably. The plaintiff accepted this and inferentially continued in his re-employment with the railroad as the fruits of the conciliatory efforts of the union

representatives. As reflected at pages 63–64 of the deposition (quoted herein, page 9) the 'action against the Union was occasioned by the dismissal of the first suit when the plaintiff learned that his original action against the railroad for wrongful discharge must, of necessity, fail for want of diversity of citizenship of the parties. When the first action was dismissed because of the plaintiff's failure to amend to state a cause of action against the Union, the plaintiff's alternative was to enter a new action and this he did, charging the Union now with discriminatory conduct.

The authorities upon which we have relied relate to railways, but the principle, that charges against union representatives must factually aver and show lack of good faith and hostile discrimination, is as well applicable to dismissal of employees in labor matters generally. Accordingly, we are aided by the Supreme Court in a recent decision. In Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L. Ed.2d 842, 1967, an employee dismissed by the employer attempted to procure intercession by the Union in his behalf for reinstatement to his employment, and the Union pursued a portion of the grievance provision in the employer-employee contract but stopped with the fourth stage after it received impartial evidence which did not support any further action on its part to procure reinstatement of its member.

In relating the facts of the Vaca case, supra, Mr. Justice White summarized what the Union had done in this way (pages 193–195, page 919 of 87 S.Ct.):

"In administering the grievance and arbitration machinery as statutory agent of the employees, a union must in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances. See Humphrey v. Moore, 375 U.S. 335, 349–350, 84 S.Ct. 363, 371–372, 11 L.Ed.2d 370; Ford Motor Co. v. Huffman, 345 U.S. 330, 337–339, 73 S.Ct. 681, 685–687, 97 L.Ed. 1048. In a case such as this, when Owens supplied the Union with medical evidence supporting his posi-

tion, the Union might well have breached its duty had it ignored Owens' complaint or had it processed the grievance in a perfunctory manner. See Cox, Rights under a Labor Agreement, 69 Harv.L.Rev. at 632–634. But here the Union processed the grievance into the fourth step, attempted to gather sufficient evidence to prove Owens' case, attempted to secure for Owens less vigorous work at the plant, and joined in the employer's efforts to have Owens rehabilitated. Only when these efforts all proved unsuccessful did the Union conclude both that arbitration would be fruitless and that the grievance should be dismissed. There was no evidence that any Union officer was personally hostile to Owens or that the Union acted at any time other than in good faith. Having concluded that the individual employee has no absolute right to have his grievance arbitrated under the collective bargaining agreement at issue and that a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious, we must conclude that that duty was not breached here."

■ To establish a cause of action, then, the plaintiff must prove more than a meritorious claim; he must also prove arbitrary or bad faith conduct on the part of the Union in representing him under the collective bargaining agreement and in processing his grievance. The burden of proof is upon the plaintiff.

■ The only support in the entire record for the claim of discriminatory conduct on the part of the defendant Union and the defendant railroad is the plaintiff's bare conclusory allegations that he was discriminated against, conclusions which are defeated, however, by his own factual assertions in the deposition. The plaintiff, it appears, was dissatisfied with his dismissal and reinstatement as a probationary employee, but he did agree to the amicable conferences in which the Union represented him. He did not request or demand any grievance process through the Union. In truth, he neither charges wrongful motivation nor wrongful intent on the part of the Union representatives in any way whatsoever. He does indicate that in some way it might have been neglectful but factually he does not assert any malice or intent of discrimination.

I must conclude, therefore, that his cause of action under federal court jurisdiction is without supportive basis in facts, and that nothing is presented that can go to the jury as an issue of fact. The factual issues which are presented by the plaintiff, whether or not he complied with the railroad's rule requiring current address on file for recall purposes and whether he was for good cause not reinstated at his prior level when he did return to work, are questions which may be presented in an action against the railroad under the contract, but are not here before me now, as decided previously by Judge Weber at Civil Action No. 66–123.

In view of this determination, it will not be necessary to treat the arguments of the defendant union that the plaintiff has failed to exhaust additional available procedures.

For the reasons stated, the motions of the defendants Union and railroad for summary judgment will be granted.