Melvin D. IRVIN and Johnie E. Lewis, Plaintiffs,

v.

**MOHAWK RUBBER COMPANY**
and
Local 539, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, Defendants.

No. H 68–C–13.

United States District Court
E. D. Arkansas, E. D.
Jan. 12, 1970.

**153**

George Howard, Jr., Pine Bluff, Ark., Barbara Morris, New York City, for plaintiffs.

J. W. Barron, Little Rock, Ark., J. P. Baker, Jr., West Helena, Ark., Joseph M. Holden, Akron, Ohio, for Mohawk Rubber Co.

James E. Youngdahl, Little Rock, Ark., for Local 539.

### MEMORANDUM OPINION

OREN HARRIS, Chief Judge.

This is a class action brought by the plaintiffs, Melvin D. Irvin and Johnie E. Lewis, Negro employees of the Mohawk Rubber Company, on their behalf and on behalf of other Negroes similarly situated, against the defendants, Mohawk Rubber Company and Local 539, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, to enjoin them from continued employment practices and procedures in violation of

Title VII of the Civil Rights Act of 1964 (42 U.S.C.A. § 2000e et seq.).

The plaintiffs allege that due to the employment practices and collective bargaining agreements of the defendants, they have been segregated in their employment which has resulted in discrimination because of their race and color, thereby depriving them of equal employment opportunities.

Plaintiffs further allege that Local 539, their collective bargaining agent, has continuously refused to represent them (members of the collective bargaining unit) fairly. Furthermore, it is contended by the plaintiffs that Local 539 has acted in such a manner as to limit the plaintiffs' employment opportunities and to adversely affect their status as employees on the basis of race and color.

Jurisdiction is invoked pursuant to 42 U.S.C.A. § 2000e-2(a) (c) (Title VII of the Civil Rights Act of 1964), 28 U.S.C.A. § 1343 and 42 U.S.C.A. §§ 1981, 1983.

Pre-trial motions for summary judgment filed by the defendants were decided on the pleadings and briefs and denied July 18, 1969. The cause of action was tried to the Court on October 1 and 2, 1969.

The Mohawk Rubber Company at all times material herein has been engaged in the manufacture of vehicle tires at its plant in West Helena, Arkansas, and has in its employment approximately 589 persons. At all times material herein the defendant union, Local 539, has been the duly certified bargaining agent for certain of the employees, or groups of employees, including the plaintiffs and the class they represent.

The Defendant Company commenced operations in West Helena, Arkansas, in 1956. It is organized into divisions and into departments within those divisions.

The Plaintiff Melvin D. Irvin has been an employee of the Defendant Company since October 20, 1956, a short time after the plant opened. Three Negroes were employed at the plant when Irvin commenced work. The Plaintiff Johnie E. Lewis has been an employee of Mohawk since 1957.

The union was organized in 1957 and recognized as the bargaining agent. Traditionally contracts have been negotiated between defendants every two years and at all times material herein there has been in effect a collective bargaining contract between the company and the union.

Until 1965, after the passage of the Civil Rights Act of 1964, all Negroes employed by Mohawk were segregated and confined to three departments of Division "B" in the plant and to the Janitorial Department 30 of Division "A". Until that time all employees of the three departments of Division "B" and Department 30 of Division "A" were Negro. There were no Negro employees in any other of the divisions or departments of Mohawk.

In April, 1966, Plaintiffs Irvin and Lewis filed a complaint with the Equal Employment Opportunity Commission against both defendants; on consideration of the complaint, the Commission found reasonable cause to believe that the Defendants Mohawk and Local 539 had violated Title VII of the Civil Rights Act of 1964.

Until September, 1966, Defendant Mohawk directly hired employees needed and necessary in the operation of the plant. At that time, which date becomes important in this proceeding, the Company changed its employment policy and begain hiring its employees through the Arkansas Employment Securities Division at Helena, Arkansas.

As of September 1, 1966, there were 554 employees of Mohawk, 454 white and 100 Negroes. Of the 100 Negroes 60 were assigned to Division "B" and 23 to Department 30 of Division "A". There were no white employees in Department 30 or in Division "B". One Negro was employed in a department of Division

"C" and 15 Negroes were employed in six departments of Division "D".

For a clearer understanding of the organizational scheme of the Mohawk Rubber Company in manufacturing and fabricating rubber products, the plant is organized into six divisions as follows:

*Division A* – comprised of departments:
- 30 janitorial department
- 31 power house
- 32 boiler room
- 33 plant maintenance

*Division B* – banbury or mixing division, which is comprised of departments:
- 02 compounding and mixing division
- 20 cement house
- 42 receiving raw materials department 50 has been combined with department 42

*Division C* – the stock preparation division which is comprised of departments:
- 04 free roll and gum calendar
- 05 tubing and milling
- 07 (which has been combined with department 17)
- Z calendar

*Division D* – building, curing and final finishing division, which is comprised of departments:
- 06 passenger band building
- 09 scrap salvage
- 10 passenger tire building
- 11 truck band and tire building
- 12 passenger tire curing
- 14 truck tire curing
- 18 final finishing and shipping
- 25 and 18 have been combined as have departments 15 and 18

*Storehouse Division*

*Statistical Quality Control Division*

———◆———

We are concerned primarily with the employment practices of Division "A", Janitorial Department 30; Division "B"; Division "C"; and Division "D".

At the time of the trial the company had in its employment some 589 employees. There were 68 employees in 15 classifications or separate job descriptions in Division "A"; there were 59 employees with 14 job classifications in Division "B"; there were 59 employees with 28 job classifications in Division

"C"; and there were 392 employees with 52 job classifications in Division "D". The other employees were in the Storehouse Division and in the Statistical Quality Control Division.

From 1957 to 1960 the collective bargaining agreement negotiated between the defendants provided that in the event of curtailment of production, or reduction in force, Negro employees in Division "A" Department 30 and those in Division "B" could not transfer to vacancies in other departments or divisions. The collective bargaining agreement prohibited inter-divisional transfer to fill vacant positions. As a result, these Negro employees were permanently "locked" into these departments and divisions by reason of their race.

From June, 1960, until August, 1968, the collective bargaining agreement (traditionally negotiated every two years) was altered only to the extent that in the event of curtailment of work, or reduction of the labor force, all employees who would have been laid off by reason of the foregoing conditions were allowed to transfer temporarily to vacant positions in divisions and departments other than their regular divisions and departments. However, upon resumption of work, these employees were required to return to their resident departments.

Complaint was made to defendants about these procedures and Plaintiff Irvin requested that non-discriminatory practices be adopted whereby employees could transfer to vacancies in any department or division on the basis of their seniority attained at the plant. The issue was considered by Defendant Local 539, which consistently refused to alter or change the procedure and allow inter-divisional transfers on the basis of seniority within the plant.

After the filing of this proceeding and during its pendency a new contract was negotiated between the defendants in June, 1968. The new contract included a provision for the filling of vacancies in the various divisions of the company plant. It provided four steps in job opportunities. Eligibility for an initial opening or vacancy was based on maximum seniority in the same department and division in which the vacancy occurred. The second step in the chain for a vacancy was open only to an employee with the greatest seniority in the division where the vacancy occurred. Employees in the other divisions and their departments were ineligible for employment to fill such vacancies. The new contract provided for only two bids in one chain. Job bidding rights were restricted to one bid in any 12-month period. Furthermore, employees were ineligible to bid until they had been employed in excess of nine months.

The third step in the chain for filling of the vacancies was by surplus help, recalled personnel (employees previously laid off) and finally newly-hired personnel. No inter-divisional transfer procedure was included.

Some two months later, in August, 1968, an amendment was negotiated, adopted and became a part of the collective bargaining agreement between the defendants. This amendment, which is now in force, becomes another important issue in this proceeding. It modifies the procedures for filling of vacancies as follows:

Eligibility for the first vacancy is limited to employees in the same department of the division in which the vacancy occurs. The vacancy is awarded to the individual with the greatest seniority who fills these prerequisites. Eligibility for the second vacancy is limited to employees of the division in which the vacancy occurs and the job is awarded to the employee with the greatest seniority of employment within the division. The third vacancy or step in the chain may be subject to bid by persons in departments and divisions other than that in which the vacancy occurs and at this point the job may be awarded to the individual with the greatest seniority in the plant and otherwise qualified.

The defendants contend that this process is required since employees in a par-

ticular labor pool necessarily become familiar with the work of others in the same pool and how it is accomplished, which often obviates the necessity of training; that people in the same department or division acquire by observation and association general familiarity or working knowledge of the jobs in their department or division; and it promotes efficiency, safety and tends to avoid costly mistakes.

Nevertheless, the result of the bidding process provided in the amended contract creates a preference in favor of employees already in the department and division where a vacancy occurs. The majority of Negro employees are still relegated to Division "B" and to the Janitorial Department 30 of Division "A" as a result of past discriminatory hiring and placement practices of Defendant Mohawk Rubber Company.

Although there have been some interdepartmental transfers under this procedure, which defendants contend is sufficient to meet the requirements under the law, it is quite obvious that within other divisions, as for example, Division "D" with the greatest number of employees, 392 and 52 job classifications, there is greater mobility and opportunity of transfer to more desirable jobs when vacancies occur. It should be noted that the employees of Department 30 of Division "A" do not enjoy the same mobility as they are not permitted to transfer to other departments in their divisions since those departments under the organizational scheme are of a technical nature requiring training as electricians or mechanics as additional prerequisites for employment.

The Court holds that because of past discriminatory employment and placement practices against Negroes, the employment opportunities of Negro employees with the greatest seniority in the company are more limited than are those of similarly-situated white employees. Negro employees confined to Division "B" and Department 30 of Division "A" from past racial discrimination, results in a "locked-in" status. The employment opportunities of white employees (who have been considered eligible for and have been employed in other departments and divisions of the plant) have greater mobility and greater opportunity for transfer to better or more desirable jobs of their choice.

As an example, the first stages in fabrication of rubber and synthetic rubber occur in Division "B". The work of this division deals with the measuring, mixing, pouring, and heating of raw materials in batches which are forwarded to other divisions for the manufacturing processes. The work in Division "B" entails a great amount of physical labor, a high degree of heat, and the area is permeated with the fumes of the heating raw materials. The greater number of jobs under more desirable conditions exist in departments and divisions other than those which are traditionally Negro.

There is no issue as to the wage scale on an hourly basis and the record fails to establish any discrimination against Negroes as a class with respect to pay.

Neither is there any issue on the question of training. All collective bargaining agreements provide for "on-the-job training" in the event of transfer of personnel to new jobs.

Also, upon the merits of the case, the Court holds that the defendant union, Local 539, has denied and continues to deny equal employment opportunity to Negro employees of Department 30 of Division "A" and Division "B" by reason of the union's failure and refusal to provide equal access to jobs in previously traditionally recognized white departments.

The Court further holds that the company is not now engaged in and has not engaged in discriminatory hiring practices and assignment procedures since September, 1966, at which time by contract it began hiring through the Arkansas Employment Securities Division at Helena, Arkansas. The plaintiffs are entitled to no relief on this issue.

The Court also holds that the defendants have discriminated against Melvin D. Irvin and Johnie E. Lewis and the class consisting of Negro employees who were hired and assigned to Janitorial Department 30, Division "A" and Division "B" before September, 1966, and still employed therein, with respect to advancement, transfer and seniority. The plaintiffs are entitled to relief correcting this discrimination.

■ The thrust of the issue in this case is whether the restrictive departmental transfer and seniority provisions of the collective bargaining agreement are intentional, unlawful employment practices because they are superimposed on a departmental structure that was organized on a racially segregated basis. Here again, the question is raised: Are present consequences of past discrimination covered by the Civil Rights Act of 1964?

The defendants would have the Court to hold in the negative. They urge the Court to adopt the view that any and all acts of discrimination prior to the Civil Rights Act, and the resultant effect since, should not interfere with departmental structure and company procedures resulting in compliance and non-discriminatory practices since September, 1966. They urge the slate should be wiped clean as of that time, the status quo accepted, and the subsequent negotiated contract be accepted as determining the rights of all employees affected thereby. The Court is not persuaded to this view.

This identical question was considered as recently as January 4, 1968, by the United States District Court–ED–VA., heavily relied upon herein by both parties. Judge Butzner, Circuit Judge of the Fourth Circuit, was designated to hear the case and rendered the decision in Quarles v. Philip Morris, Incorporated, reported in 279 F.Supp. 505.

As it is with the Defendant Mohawk, the Quarles case, supra, involved departmental structure with Philip Morris and job classifications in each department.

Employees were hired from the street. There were departments with traditionally white employees, although there were a token number of Negroes employed therein. The "prefabrication" department was formerly staffed with only Negroes. The collective bargaining agreement provided that vacancies in the "prefabrication" department be filled by senior employees from the "stemmery". The "stemmery" was considered seasonal and formerly all employees were Negro. There were sub-departments in the structure of the company's operation.

There, as here, most of the opportunities for advancement, or for the exercising of other privileges depended upon "departmental seniority" rather than "employment seniority". Departmental seniority is generally a factor in the transfer, promotion and avoiding layoffs. They are each based on the date of employment. Departmental seniority is clearly given preferred treatment over employment seniority.

In the Quarles case, as here, operation of the company's business on departmental structure with restrictive departmental transfers serve numerous legitimate management functions. It is undisputed that it promotes efficiency, encourages employees to remain with the company on the basis of prospective advancement and limits similar training that would otherwise be necessary. However, there, as here, organization of the departments (and divisions) on a racially segregated basis has prevented Negroes from advancing on their merits to jobs open only to white personnel. The method of hiring without regard to race since a given date and the relaxation of departmental transfers has only partly eliminated this disadvantage. The court stated:

"The present discrimination resulting from historically segregated departments is apparent from consideration of the situation of a Negro who has worked for ten years in the prefabrication department. In 1957 because of his race he could not get a job in the fabrication department, where the better paying

jobs are. The six months agreement for transfers was unavailable to him until 1961, and then regardless of his qualifications and the vacancies, only two Negroes could transfer every six months. * * * In contrast, the opportunities of a white employee who was hired nine years ago are considerably better than the Negro with ten years employment seniority. The white employee, because of his race, could start to work in the fabrication department. His opportunities for advancement are not limited to four vacancies every six months and he does not have to compete for transfer with persons who have greater employment seniority." *Quarles,* supra, at page 513.

While the terms and procedures are distinguishable between the two operations in *Quarles,* supra, and the instant case, the parallel is the same to the effect that the entry level position with departmental seniority is lower for the Negro employee than a white employee with years less employment seniority. The restrictions on present opportunities for Negroes result from the racial pattern of the company's employment practices prior to September, 1966. They do not result from lack of merit or qualification. A transfer under any plan must meet the requirements as to ability and merit regardless of his seniority.

Title VII of the Civil Rights Act of 1964, pertinent to this case, provides:

Section 703(a), 42 U.S.C. § 2000e–2 (a):

"It shall be an unlawful employment practice for an employer—

"(1) to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Section 703(c), 42 U.S.C. § 2000e–2 (c):

"It shall be an unlawful employment practice for a labor organization—

"(1) to exclude or to expel from its membership or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

"(2) to limit, segregate, or classify its membership, or to classify or fail to refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

Section 703(d), 42 U.S.C. § 2000e–2 (d):

"It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."[1]

---

[1]. An excellent analysis of the legislative history of Title VII of the Civil Rights Act of 1964 is included by Circuit Judge Butzner in his opinion in Quarles v. Philip Morris, Incorporated, D.C., 279 F.Supp. 515–517.

In the application of these provisions in *Quarles*, supra, it is stated at page 518:

"While no case precisely on point appears to have been decided, the governing principles are not new. Present discrimination may be found in contractual provisions that appear fair upon their face, but which operate unfairly because of the historical discrimination that undergirds them. NLRB v. Local 269, IBEW, 357 F.2d 51 (3rd Cir. 1966). Departmental seniority rooted in decades of racially segregated departments can neither mask the duty of a union to fairly represent its members nor shield the employer who is privy to the union's derelictions. Central of Georgia Railway Co. v. Jones, 229 F.2d 648 (5th Cir. 1956), cert. den., 352 U.S. 848, 77 S.Ct. 32, 1 L.Ed.2d 59 (1956)."

In a more recent decision, United States v. Sheet Metal Workers International Association, Local Union No. 36, 416 F.2d 123, September 16, 1969, the United States Court of Appeals for the Eighth Circuit, on this point stated at page 131:

"Both plans effectively operate to deprive qualified Negroes of an equal opportunity for employment as journeymen electricians or as sheet metal workers. Because the plans carry forward the effects of former discriminatory practices, they result in present and future discrimination and are violative of Title VII of the Act." (See Note 15 which cites Quarles v. Philip Morris, Incorporated, supra)

The Court finds that the defendants have intentionally engaged in unlawful employment practices by discriminating on the basis of race against Irvin and Lewis, and other Negroes similarly situated. The Court further finds that this discrimination, embedded in seniority and transfer provisions of collective bargaining agreements, adversely affects the conditions of employment and opportunities for the advancement of the class.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action. 42 U.S.C.A. §§ 2000e–5(f), 1981, 1983, 28 U.S.C.A. § 1343.

2. The defendant Mohawk Rubber Company is an employer engaged in an industry affecting commerce as those titles are defined in Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e(b).

3. The defendant Local 539, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, is a labor organization engaged in an industry affecting commerce as those titles are defined in Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e(d) (e).

4. This is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiffs, Melvin D. Irvin and Johnie E. Lewis, are appropriate representatives of that class.

5. The policies and practices of defendant, Mohawk Rubber Company, prior to September, 1966, were discriminatory on the basis of race. The procedure currently used by defendant, Mohawk Rubber Company for transfer from one job classification to another and between divisions operates unfairly as to those employees in the Janitorial Department 30 of Division "A" and those employees of Division "B" employed prior to September, 1966, and perpetuates past discriminatory practices of defendant, Mohawk Rubber Company, as to such employees.

6. Where an employer has engaged in such a pattern and practice of discrimination on account of race and color, as described herein, and in order to insure the enjoyment of rights protected by law, Title VII of the Civil Rights Act of 1964, require affirmative and mandatory injunctive relief.

7. Local 539, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, as the collective bargaining agent of the employees, by reason of having negotiated contracts which deny to certain Negro production employees equal access to jobs in previously white

departments of certain divisions in the company's structure and which circumscribe, limit and deny equal employment opportunities to such Negro production employees of defendant Mohawk (which they represent) has denied those Negro employees full enjoyment of the rights protected by Title VII of the Civil Rights Act of 1964 and fair representation mandated by law. Accordingly, affirmative and mandatory injunctive relief is required.

The parties have proposed remedies deemed appropriate under Section 706 (g) [42 U.S.C.A. § 2000e–5(g)], which provides in part:

> "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, * * *."

■ Neither of the remedies suggested appear altogether satisfactory. It does not appear necessary to abolish departmental structure of the company's business. It is unnecessary to require the company to forego the efficiencies which it has found in its departmental organization. It appears that the plaintiffs' proposal, while not ousting white employees from present jobs, is too general, too broad in its purport, and could conceivably give preferable treatment to Negroes even though they may have less employment seniority than whites. This is not contemplated in the Act.

The proposals made by the company and the union would continue to subordinate the affected Negroes to white employees regardless of employment seniority. These proposals would result in a continuation of racial discrimination applicable to those employed by the company prior to September, 1966.

■ In fashioning a remedy it should be kept in mind that the departmental rights of white employees are not vested, indefeasible rights. They are expectancies derived from the collective bargaining agreement and are subject to modification. Quarles, supra, 279 F.Supp. page 520. Cases cited.

■ In Central of Georgia Ry. Co. v. Jones, 229 F.2d 648, 650 n. 3 (5th Cir. 1956), cert. den., 352 U.S. 848, 77 S.Ct. 32, 1 L.Ed.2d 59 (1955), the court issued a decree affirmatively requiring the union and company to grant "the same seniority rights, training privileges, assignments and opportunities to these jobs as white persons of similar continuous service would enjoy." Consequently, the remedy here should permit these Negro employees (Irvin and Lewis) and those of their class to train and advance on the same basis as white employees with comparable ability and employment seniority. At the same time, the remedy should disturb as little as possible the efficiencies which the company finds in its departmental structure.

In providing for injunctive relief in this case, the decree will provide that all Negroes employed by the company before September, 1966, who now work in the Janitorial Department 30 of Division "A" and who work in Division "B" shall be given an opportunity to transfer to the other Divisions "C" and "D" to fill vacancies as they exist, should they elect to transfer and are qualified for the jobs they seek.

Members of the class who may be transferred in accordance with this decree and members who previously transferred under existing procedures shall have departmental seniority computed from their employment seniority date. The existing procedures and practices of the company and union, in accordance with the negotiated contracts in all other respects, will be permitted.

The company and the union will be restrained from enforcing directly or indirectly any provision of any collective bargaining agreement or practice or from taking any other action which conflicts with the terms of this decree.

■ The plaintiffs are entitled to recover from the defendants, jointly and

severally, their costs, including a reasonable attorney's fee, 42 U.S.C.A. § 2000e–5(k). If after thirty days the parties have not agreed upon a reasonable attorney's fee, the Court will determine and allow it upon consideration of a statement of services filed and served upon counsel for the defendants, who shall have fifteen days to serve and file a response.

A decree will be entered in accordance with these findings and conclusions.