**UNITED PACKINGHOUSE, FOOD AND ALLIED WORKERS INTERNATIONAL UNION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Farmers' Cooperative Compress, Intervenor.**

**FARMERS' COOPERATIVE COMPRESS, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Packinghouse, Food and Allied Workers International Union, AFL–CIO, Intervenor.**

**Nos. 21627, 21825.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 25, 1968.

Decided Feb. 7, 1969.

Petitions for Rehearing Denied May 12, 1969.

Certiorari Denied Nov. 10, 1969. See 90 S.Ct. 216.

Mr. Richard F. Watt, Chicago, Ill., with whom Messrs. Eugene Cotton, Chicago, Ill., and Michael H. Gottesman, Washington, D. C., were on the brief, for petitioner in No. 21,627. Mr. Michael H. Gottesman, Washington, D. C., entered an appearance for intervenor in No. 21,825.

Mr. John Edward Price, Fort Worth, Tex., for petitioner in No. 21,825 and intervenor in No. 21,627.

Mrs. Nancy M. Sherman, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Mitchell L. Strickler, Atty., National Labor Relations Board, were on the brief, for respondent.

Before PRETTYMAN, Senior Circuit Judge, and DANAHER * and WRIGHT, Circuit Judges.

## J. SKELLY WRIGHT, Circuit Judge:

Farmers' Cooperative Compress is a Texas corporation engaged in processing cotton. The United Packinghouse, Food and Allied Workers, AFL-CIO was certified as representative of the company's production and maintenance employees in December 1965 after an election conducted by the National Labor Relations Board. The union and the company thereupon commenced bargaining over a contract, the sessions lasting until June 1966. On September 13, 1966, after filing unfair labor practice charges with the Board, the union struck the plant. The Board found that the company had violated Sections 8(a) (1)[1] and 8(a) (5)[2] of the National Labor Relations Act. It ordered the company to cease and desist certain practices, to bargain in good faith with the union over economic working conditions, to bargain in good faith with the union over the condition of racial discrimination against Negro and Latin American workers, and to reinstate strikers with back pay.[3]

■ We have before us: (1) the company's claim that the Board's order against it was not supported by the evidence[4]; (2) the union's claim that the Board's order did not go far enough —the union agrees with the Board's finding that the company's refusal to bargain over racial discrimination violates Section 8(a) (5), but the union argues that the Board should also have found that the company's practice of discrimination against Latin American and Negro employees is itself a violation of Section 8(a) (1)[5]; and (3) the

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

1. 29 U.S.C. § 158(a) (1) (1964):
   "It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title[.]"
   29 U.S.C. § 157 (1964) (§ 7 of the Act):
   "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

2. 29 U.S.C. § 158(a) (5) (1964):
   "It shall be an unfair labor practice for an employer—

   *       *       *       *       *
   "(5) to refuse to bargain collectively with the representative of his employees * * *."

3. The order is found at 169 N.L.R.B. No. 70 (1968).

4. We find no merit in the company's claim that the order is ambiguous.

5. The union makes two other claims. As to the first—that the remedy against the company in general is insufficient—see Note 7 *infra.* As to the second—that the Board erred in not following the Examiner in finding that the company's rejection of an arbitration clause was a violation of § 8(a) (5)—we think that in the circumstances of this case it was within the Board's discretion not to rely on the Examiner's finding in this respect.

Board's cross-petition for enforcement of its order as it stands.

We affirm the Board's order against the company. The particulars of the labor dispute, the unfair labor practices, and the basis for our enforcement of the Board's order are set out in Parts I and II of this opinion. In addition, without staying the enforcement of that order, in Part III we remand the case to the Board for a hearing on whether the company has a policy and practice of discrimination against its employees on account of their race or national origin. We hold that such a policy and practice violates Section 8(a) (1) of the Act. If the Board finds that the company engages in such a policy and practice, it will devise an appropriate remedy.

## I

■ The Trial Examiner found, and the Board adopted his finding,[6] that:

"Between the strike vote and the strike, and particularly during the several weeks just before the strike, Respondent [company] engaged in numerous interrogations, threats and promises, in an effort to undermine the Union's bargaining power and its capacity to mount a successful strike."

The evidence the Examiner adduced to support his finding included statements by the company's general manager, assistant manager, plant supervisor and other company officials to some employees to the effect that if the employees did not join the strike they would receive better-paying jobs and other benefits. The Examiner also found that company officials told the employees to spread the word of these benefits for men who did not join the strike. The Examiner concluded that the company thereby violated Section 8(a) (1).

Our standard on review is whether there is substantial evidence to support the Board's findings. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct.

456, 95 L.Ed. 456 (1951); American Federation of Television & Radio Artists v. N.L.R.B., 129 U.S.App.D.C. 399, 395 F.2d 622 (1968). Here there is little doubt that the Board could reasonably find that the actions of the company officials had the effect, in the words of Section 8(a) (1), of "interfer[ing] with, restrain[ing], or coerc[ing] employees" in the exercise of their rights to organize and to strike, as guaranteed in Section 7 of the Act. Indeed, on oral argument the company conceded that these actions violate Section 8(a) (1).

■ The Trial Examiner also found, and the Board adopted the finding, that the company did not intend to bargain in good faith; he found that the company never intended to enter into a contract. To support this conclusion he relied, *inter alia,* on the following: a company official made a statement to some employees to the effect that the company would never sign a contract with the union; the company's initial contract offer, in response to the union's first proposal, set out wage scales essentially unchanged from the existing ones; the company refused to bargain about "cost" items, *i. e.,* items which would increase the company's expenses (these included pay during funeral leave, overtime pay, holiday pay, retirement benefits, sick and accident pay, the furnishing of tools, clothing allowance and life insurance); the company instituted during the bargaining a holiday for the employees; the company gave a dinner for employees during the bargaining at which it announced, with insufficient notice to the union to allow meaningful bargaining, a wage increase. The Examiner found that the bargaining had not reached a valid impasse; rather, he found that the company had a take-it-or-leave-it attitude throughout the bargaining. Thus he concluded that even though the company had agreed to several union proposals the company was bargaining in bad faith.

6. The Board adopted the Examiner's findings with minor exceptions having to do with practices the Examiner found which the Board felt were not fully litigated on the record before it.

The company's obligation under Section 8(a) (5) to bargain in good faith about the conditions of employment must be "more than a willingness to enter upon a sterile discussion of union-management differences." N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L. Ed. 1027 (1952). The facts going into a determination of good faith must be viewed as a whole—"[t]here is no *per se* test of good faith" in bargaining. Warehousemen & Mail Order Employees, Local No. 743 v. N.L.R.B., 112 U.S. App.D.C. 280, 283, 302 F.2d 865, 868 (1962). We have said that good faith bargaining is "largely a matter for the Board's expertise." Fruit & Vegetable Packers and Warehousemen, Local 760 v. N.L.R.B., 114 U.S.App.D.C. 388, 389–390, 316 F.2d 389, 390–391 (1963).

We cannot say here that substantial evidence to support findings of Section 8(a) (1) and Section 8(a) (5) violations was lacking. No valid bargaining impasse can be said to occur when the bargaining deadlock is caused by the failure of one of the parties to bargain in good faith. Industrial Union of Marine & Shipbuilding Workers v. N.L.R.B., 3 Cir., 320 F.2d 615 (1963), *cert. denied*, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). The company's bargaining posture is certainly open to interpretation as a take-it-or-leave-it stance, and the holiday and wage increases can well be said to have been calculated to undermine the union's bargaining position. These circumstances warrant upholding the Board's finding of unfair labor practices.[7] See N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); N.L.R.B. v. Insurance Agents' Intern. Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); N.L.R.B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949); May Department Stores Co. v. N.L.R.B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945).

## II

The Trial Examiner found, and the Board affirmed, that the company further violated Section 8(a) (5) in that:

"In addition to refusing to bargain in good faith concerning economic matters, Respondent also refused to bargain in good faith with the Union concerning the elimination of discriminatory racial practices going on in the plant. Respondent bargained with the Union on the inclusion of a non-discrimination clause in the contract, while simultaneously refusing to bargain meaningfully and in depth concerning actual racial discrimination practices then going on. * * *"

To determine if the company violated Section 8(a) (5) in this respect, the Examiner first admitted testimony on whether discrimination did in fact exist. This testimony included matters brought up in the bargaining as well as general practices in the plant.[8]

7. On the matter of remedy, the union requested that the Board give compensatory relief to the workers by making them whole for any gains they would have received but for the company's refusal to bargain and reach agreement. The Board denied this relief without giving any reasons. Such relief is being considered by the Board in at least four pending cases. The matter of remedy is, of course, a matter for the Board's discretion. However, we think that the Board should state reasons when it wholly denies a major type of relief requested, at least where it is actively considering such relief elsewhere. Since this case is being remanded on the discrimination issue, it will be open to the union to renew its request for compensatory relief at that time. Should the Board deny the relief, such denial should be accompanied by a brief statement of the reasons therefor.

8. The Examiner considered some practices and events which arose more than six months prior to the filing of unfair labor practice charges and thus could not be considered as violations of the Act. 29 U.S.C. § 160(b) (1964). However, the Examiner properly considered this evidence "to shed light on the true character of matters occurring within the limitations period." Local Lodge No. 1424, Int. Ass'n of Machinists v. N. L. R. B.,

Roughly summarized, the evidence indicates the following facts:

In west Texas, where the company's plant is located, it is common practice to classify people into three groups—Negroes, Latin Americans (also called Mexicans) and whites (also called Anglos). A person is regarded as Latin American if he is of Mexican origin, regardless of whether he was born in or is a citizen of the United States. The company employed up to 550 persons in its busy season, about 85 to 100 persons otherwise. The employees came from all three "racial" classifications, a sizable percentage being Negroes and Latin Americans.

The company has a few employees with guaranteed weekly salaries over the year. These jobs were filled by whites. The company's highest hourly rate jobs—$1.80 per hour—were filled largely by whites. One employee, Jesse Ruiz (a Latin American), worked on a job weighing cotton. He had been classified in a different job which was scaled for a lower hourly wage. He was paid this latter wage, even though he did the work of a weigher. The other weighers, with one exception,[9] were white, and all received the higher wage.

The company's warehouses have a sprinkler system for fire prevention. Until 1963, any employee who wanted to, including Latin Americans and Negroes, could and did receive overtime work as fireguards checking the sprinklers. In 1963 an electric alarm system was installed, and as a result there was need for only two men to check the sprinklers. The two men who received this overtime work were whites. A Latin American had asked for the work but did not get it. From 1963 to 1966 (the time of the charges and hearing) no Negroes or Latin Americans got this work. The qualifications for checking the sprinklers were not high; in fact, there was evidence that the two whites had to be shown how to set the sprinkler valves, something which other employees, including Negroes and Latin Americans, knew how to do.

The company had an annual practice of providing, at its expense, group fishing trips for its employees. Regarding these trips, the Examiner found:

" * * * First, Respondent takes office personnel and Anglo employees and their wives on a fishing trip; next it takes Anglo employees who do not wish to take along their wives; next it takes Latin and Negro employees without their wives. In 1965 and 1966 the Anglo trips were to a point about 700 miles away and lasted the best part of a week; the Latin-Negro trips were to a point about 300 miles away and lasted no more than 3 or 4 days. * * * "

The Examiner concluded that these facts showed discrimination. He found that the company failed to bargain in good faith about the two specific issues the union raised in the negotiations: employee Ruiz and the sprinkler work.[10] As to Ruiz, he found that the company took evasive positions, denying at first that Ruiz did a weigher's job, then saying that maybe he was unqualified, and finally saying there was nothing the company could do about it. With regard

---

362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960); Int. U., United Automobile etc. Workers v. N. L. R. B., 124 U.S.App.D.C. 215, 219, 363 F.2d 702, 706 (1966).

9. The one exception was a Latin American who had reached the $1.80 pay scale in another department and then was transferred to work as a weigher.

10. The company did agree to a general nondiscrimination clause. However, the Examiner could reasonably have found that such a clause meant little if the company would not also work to correct individual grievances. See Local Union No. 12, United Rubber etc. Workers v. N. L. R. B., 5 Cir., 368 F.2d 12, 14 (1966), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967), where the collective bargaining agreement seniority provided for non-discriminatory seniority for employees but where "[a]s a matter of custom and interpretation * * * Negro employees with greater seniority had no rights over white employees with less seniority * * *."

to the sprinkler work, the Examiner found that the company was equally evasive. First the company said that no Negroes or Latin Americans got the work because none applied. When it was pointed out that at least one had asked for the work, the company then said that the whites were more qualified, but offered no proof to that effect (in fact the evidence indicated the reverse). The evidence amply supports the Examiner's conclusion that the company did not bargain in good faith over these employment conditions.

Finally, the union proposed that the company change its policy of using employees in higher-paying work while maintaining their lower-paying classifications. The union sought to establish a seniority system and open bidding for high-paying jobs that opened up, either permanently or temporarily. It was in this context that the Ruiz discussion took place. The company refused to relinquish its status of being the sole judge of qualifications, and the Examiner found that the company

"gave no meaningful reasons for its positions on these issues. The basic reasons were that the Union's proposals challenged the status quo which protected the practice of racial discrimination, and Respondent did not intend to change that practice."

The Board, adopting the Examiner's findings, ordered the company to bargain in good faith with the union over racially discriminatory practices. The record fully supports the Board's order.[11]

---

11. One issue, discussed by the Board and the union in their briefs, bears comment: whether the Board is deprived of jurisdiction in the area of racial discrimination by the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–12(a) (1964). Section 704 of that Act, 42 U.S.C. § 2000e–3(a), provides that an employer's racial discrimination is unlawful. The Act sets up machinery for individuals to bring grievances to the Equal Employment Opportunity Commission. However, the Commission has no enforcement power of its own, and ultimately the individual has to go to court to enforce his rights.

The Act itself says nothing to indicate that the National Labor Relations Board is ousted from jurisdiction in these matters, and an examination of the legislative history demonstrates that the Board was not meant to be. Senator Clark read to the Senate a letter from the Department of Justice regarding this point. The letter stated, in part:

"* * * If a given action should violate both title VII and the National Labor Relations Act, the National Labor Relations Board would not be deprived of jurisdiction. * * * [T]itle VII would have no effect on the duties of any employer or labor organization under the NLRA or under the Railway Labor Act, and these duties would continue to be enforced as they are now. * * *"

110 CONG.REC. (Part 6) 7207 (1964). Later, Senator Tower proposed an amendment to the Act which would have made the provisions of Title VII the exclusive means of relief for such practices, depriving "any department, agency, or instrumentality in the executive branch of the Government, or any independent agency of the United States" from granting relief. The amendment was defeated by a vote of 59 to 29. 110 CONG.REC. (Part 10) 13650–13652 (1964).

Since Title VII does not give to the EEOC any enforcement powers, it may be advantageous for a person aggrieved by racial discrimination in employment to use other means of obtaining relief. Professor Rosen has noted:

"* * * Primarily because the NLRB bears the expenses of enforcement of the NLRA, offers the other general advantages of administrative enforcement, has a backlog time before the NLRB six months shorter than before the federal district courts, and has no express requirement to defer to state FEP [Fair Employment Practices] agencies, representatives of civil rights organizations have preferred NLRB enforcement over title VII enforcement of FEP. * * *"

Rosen, Division of Authority Under Title VII of the Civil Rights Act of 1964: A Preliminary Study in Federal-State Interagency Relations, 34 GEO.WASH.L. REV. 846, 887 (1966). (Footnotes omitted.)

The Fifth Circuit, in Local Union No. 12, United Rubber etc. Workers v. N. L. R. B., *supra* Note 10, noted that a claim of unfair labor practices against a union for racial discrimination could be brought

## III

We turn now to the question: can an employer's policy and practice of invidious discrimination against its employees on account of race or national origin violate Section 8(a)(1) of the National Labor Relations Act? When established as hereinafter discussed, we answer this question in the affirmative and remand this part of the case to the Board for further proceedings.[12]

Preliminarily, we find that the area of racial discrimination is not new to the Board. Although we have found no cases in which an employer's policy of discrimination as such was alleged to be a violation of the Act, there is a history of union discrimination coming within the Board's jurisdiction.

That history begins with holdings by the Supreme Court that unions have a statutory duty of "fair representation," first under the Railway Labor Act, later under the National Labor Relations Act. This duty means that a union cannot discriminate against Negroes when it represents the interests of employees. Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Syres v. Oil Workers International Union, Local No. 23, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957).

The Board adopted the Court-enunciated doctrine of fair representation and found that its violation is a union unfair labor practice under the NLRA. Independent Metal Workers Union, Local No. 1, 147 N.L.R.B. 1573 (1964); Locals 1367 & 1368, International Longshoremen's Ass'n, 148 N.L.R.B. 897 (1964), enforced, 5 Cir., 368 F.2d 1010 (1966), cert. denied, 389 U.S. 837, 88 S.Ct. 58, 19 L.Ed.2d 99 (1967); Local No. 12, United Rubber etc. Workers, 150 N.L.R.B. 312 (1964), enforced, 5 Cir., 368 F.2d 12 (1966), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967). The Fifth Circuit enforced the Board's order in *Rubber Workers*, upholding its determination that violation of the duty of fair representation is an unfair labor practice. This court, relying on the above line of cases, has reached the same conclusion. Truck Drivers & Helpers, Local Union 568 v. N. L. R. B., 126 U.S. App.D.C. 360, 379 F.2d 137 (1967). With the exception of *Truck Drivers*, these cases all involved racial discrimina-

before the Board despite Title VII's making such discrimination an unlawful union practice. Similarly here, it is open to the employees to use either Title VII or the NLRA or both. The Board has concurrent jurisdiction with the EEOC. *Compare* the concurrent jurisdiction of United States agencies to remedy discrimination in employment in federal programs under Executive Order No. 11246, 30 FED.REG. 12319 (1965).

12. The posture of this case leads us to order a remand on this issue. The unfair labor practice hearing against the company included a charged violation of § 8(a) (5) for failure to bargain about racial discrimination. However, the Board's General Counsel explicitly did not proceed on a theory that the discrimination itself violated § 8(a) (1). As noted, evidence indicating racial discrimination was produced to aid in finding whether there was a § 8(a) (5) bargaining violation. Thus the matter of the company's racial policies was litigated and the Examiner found, and the Board agreed, that the company did practice racial discrimination. We think, however, that in fairness to the company it should have an opportunity to have the matter more fully litigated, with notice that the question of a § 8(a) (1) violation is specifically to be determined. Thus the case is remanded to the Board to conduct such a hearing.

We note that where the matter is litigated, even though the particular violation has not been specifically charged, the Board can find such a violation. *See* American Newspaper Publishers Ass'n v. N. L. R. B., 7 Cir., 193 F.2d 782 (1951); Independent Metal Workers Union, Local No. 1, 147 N.L.R.B. 1573 (1964).

tion. Thus it is apparent that the Board has not felt itself unable to examine charges of union racial discrimination to determine whether they are true, and, if true, what the effect is on the discriminated employees. No reason appears why employer discrimination is exempted from Board scrutiny.[13]

In order to hold that employer racial discrimination violates Section 8(a) (1) it must be found that such discrimination is not merely unjustified, but that it interferes with or restrains discriminated employees from exercising their statutory right to act concertedly for their own aid or protection, as guaranteed by Section 7 of the Act.[14] To be sure, Section 7 rights are not to be taken narrowly. That section protects concerted activity by workers to alleviate oppressive working conditions, regardless of whether their activity is channeled through a union, through collective bargaining, or through some other means. Morrison-Knudsen Co. v. N. L. R. B., 9 Cir., 358 F.2d 411 (1966); Salt River Valley Water Users' Ass'n v. N. L. R. B., 9 Cir., 206 F.2d 325 (1953). And racially integrated working conditions are valid objects for employee action. N. L. R. B. v. Tanner Motor Livery, Ltd., 9 Cir., 349 F.2d 1 (1965). The right to act concertedly for mutual aid obviously includes the right to act freely, without employer compulsion or deterrence against such activity. Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081 (1945). Thus in the context of employer racial discrimination the question reduces to whether that discrimination inhibits its victims from asserting themselves against their employer to improve their lot.

We find that an employer's invidious discrimination on account of race or national origin has such an effect. This effect is twofold: (1) racial discrimination sets up an unjustified clash of interests between groups of workers which tends to reduce the likelihood and the effectiveness of their working in concert to achieve their legitimate goals under the Act; and (2) racial discrimination creates in its victims an apathy or docility which inhibits them from asserting their rights against the perpetrator of the discrimination. *We find that the confluence of these two factors sufficiently deters the exercise of Section 7 rights as to violate Section 8(a) (1).*[15]

The first effect is obvious—racial discrimination sets apart the white from the Negro (and Latin American) workers. The principle of "divide and conquer" is

13. The Board has examined employer racial discrimination in another context. It has held that an employer violates the Act if, during an election to certify a union, the employer makes flagrant appeals to racial prejudice in an attempt to defeat the union. *See, e. g.,* Sewell Manufacturing Co., 138 N.L.R.B. 66 (1962).

14. It should be noted that no one in this case is attempting—nor could such an attempt possibly succeed—to justify racial discrimination in employment. It has always been unjustified, even before it was explicitly made illegal by Title VII of the Civil Rights Act of 1964. Neither is anyone questioning the enormous impact such discrimination has on the flow of commerce and on the allocation of economic resources in this country, perhaps best summed up by the appalling fact that as of 1963 "the Negro college graduate * * * on the average earn[ed] less in his lifetime than the white 8th grade drop ·

out." Friedman, Racial Problems and Labor Relations: The Civil Rights Act, in T. CHRISTENSEN (ed.), N.Y.U. EIGHTEENTH ANNUAL CONFERENCE ON LABOR 367, 369 (1966) (referring to Bureau of Census figures given in Senate hearings on the civil rights bill).

15. We are not faced with a situation where an employer arbitrarily groups employees on some basis other than race. On oral argument a hypothetical situation was posed where an employer grouped workers by political party affiliation. Counsel for the union took the position that such action, simply because it is arbitrary and sets workers apart, would violate the Act. We need not go so far here; we only decide that the Act is violated where the arbitrary discrimination also has the effect of producing a docility in its victims which inhibits the exercise of their § 7 rights.

older than the history of labor relations in this country, but that does not lessen its application here. The white workers expend their energy against the Negroes, the latter resent the whites, and neither group sees that sometimes their interests might be better served by joint action against their common employer. When white employees may suffer from upgrading the positions of Negroes, the employer's policy of discrimination inevitably sets group against group, thus frustrating the possibility of effective concerted action.[16]

Gunnar Myrdal, in his study AN AMERICAN DILEMMA (1944), noted this factor in employment race relations:

"When once the white workers' desires for social prestige become mobilized against the Negroes * * *, when they have come to look upon Negroes as different from themselves and consequently do not feel a common labor solidarity with them, 'economic interests' also will back up discrimination. * * * To give white workers a monopoly on all promotions is, of course, to give them a vested interest in job segregation.

"Negroes, on their side, have to try to utilize every opening, even if it means working for lower wages or under inferior working conditions. The abundance of Negro labor, kept idle because of exclusionist policies, must always be feared by white workers. If given the chance, Negroes will accept positions as 'sweatshop' competitors— something which cannot fail to increase the resentment of white wage earners. * * * The Negroes react by being suspicious of the white workers and their unions. * * *

"The racial beliefs are conveniently at hand to rationalize prejudice and discriminatory practices. * * *"

Vol. 1, pp. 391–392.

The Board does not dispute Myrdal's findings. Rather, it points to other discriminations in employment, such as that based on seniority; it suggests the conflicting interests resulting from a seniority system cannot support a Section 8(a) (1) charge. This argument misses the point. First, the seniority distinction may be reasonably justified, whereas here the basis for discrimination is not only unjustified but in fact illegal. Second, we are not holding that all discrimination, even where unjustified, is by itself sufficient to make out a violation. Rather, as noted in Note 15, *supra*, it is the conjunction of the unreasonable and illegal discrimination with the induced docility in the discriminated group which is the basis of our unfair labor practice holding.

The conclusion that racial discrimination may impede its victims in asserting their rights seems inescapable. This docility stems from a number of factors— fear, ignorance of rights, and a feeling of low self-esteem engendered by repeated second class treatment because of race or national origin. Discrimination in employment is no different in this respect than discrimination in other spheres. In its historic decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954), the Supreme Court stated:

" * * * To separate [Negroes] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may effect their hearts and minds in a way unlikely ever to be undone. * *"

This docility has been recognized by union leaders, businessmen, government officials and psychologists. Thus George

16. This effect was noted by James B. Carey, president of the International Union of Electrical, Radio and Machine Workers, in his testimony before the House on the 1963 equal employment bills. HEARINGS BEFORE GENERAL SUBCOMMITTEE ON LABOR, HOUSE COMMITTEE ON EDUCATION AND LABOR, ON H.R. 405, 88th Cong., 1st Sess., pp. 66–67 (1963). *See also* Drotning, Race Propaganda: The NLRB's Impact on Employer Subtlety and the Effect of This Propaganda on Voting, 18 LAB.L.J. 172 (1967).

Meany, president of the AFL-CIO, referred to the reluctance of Negro employees to file complaints under fair employment practices laws because of the fear of retaliation which accompanies racial discrimination.[17] Senate and House hearings on equal employment bills are laced with references to the degradation, disillusionment, lack of motivation, and lessening of incentive to improve which result from racial discrimination in employment.[18] The Civil Rights Commission has shown the debilitating effect of menial labor on Negroes, and has pointed up the reluctance of those Negroes to ask for improvement.[19] Psychological studies have pointed out the psychologically debilitating effects of discrimination in general,[20] and Dr. Kenneth B. Clark, especially in his book DARK GHETTO (1965), has shown how discrimination-induced self-hatred in Negro inhabitants of slums, due in good part to discrimination in employment, creates a feeling of inferiority and lack of motivation to assert themselves to change their condition. In all this, discrimination in employment thus establishes, or reinforces the effect of, discrimination in other areas—an inhibition to act for change.[21]

Finally, this docility has been demonstrated by the record in this case. The Trial Examiner found explicitly that the policy of discrimination had this effect. His decision noted:[22]

"The great sense of inferiority of the 'Mexican' in the area * * * was shown by answers on cross-examination of the chairman of the negotiating committee, Fernando Gonzales. Although by his demeanor he impressed me as one of the natural leaders of the Latin group of employees, an impression corroborated by his selection as chairman of the negotiating committee, he was not inclined to stand up for his rights when, the morning after the first bargaining session, which he had attended, he was sent out into the cold to perform the 'flagging' job. Asked on cross-examination if he asked why he was being sent out there, Gonzales replied, 'You don't ask questions there, sir; you only do what you are told.' * * *

17. HEARINGS BEFORE SUBCOMMITTEE ON EMPLOYMENT AND MANPOWER, SENATE COMMITTEE ON LABOR AND PUBLIC WELFARE, ON S. 773, 88th Cong., 1st Sess., p. 153 (1963) (statement of George Meany). *See also id.* at p. 169 (statement of Walter Reuther, president, United Automobile Workers and Industrial Union Department, AFL-CIO); *id.* at p. 425 (statement of Roy Richardson, personnel manager, Honeywell-Aeronautical Division).

18. *See* SENATE HEARINGS, *supra* Note 17, p. 383 (colloquy among Senators Clark and Pell and Herman P. Miller, Bureau of Census); HOUSE HEARINGS, *supra* Note 16, p. 49 (statement of Congressman Jacob Gilbert); *id.* at p. 364 (report of D. C. Advisory Committee to U. S. Commission on Civil Rights). *See also* H.R. Rep. No. 570, 88th Cong., 1st Sess., p. 3 (1963); H.R.Rep.No.914, 88th Cong., 1st Sess. (1963) (additional statement of Congressman William M. McCulloch *et al.*), reprinted in 2 U.S. CODE CONG. & AD.NEWS 2391, 2514-2515 (1964).

19. *See* U.S. COMMISSION ON CIVIL RIGHTS, CYCLE TO NOWHERE 29-33 (1968).

20. *See* H. WITMER & R. KOTINSKY (eds.), PERSONALITY IN THE MAKING ch. VI (1952).

21. The Board argues that because some Negroes or Latin Americans do not react passively, and many, as in this case, do join unions, this docility effect does not exist. However, as the text shows, the effect does exist for the majority of discriminated Negroes and other minority groups of different national origin. In 1954 some Negro children stood up for their rights and demanded integration while other Negro children continued to go to segregated schools. This circumstance does not gainsay the Supreme Court's finding in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954), of the debilitating effects of discrimination.

22. These excerpts from the Examiner's decision are not meant to show particular violations of the Act; rather, they are quoted to illustrate the docility produced by discrimination.

"This same sense of inferiority and docility on the part of the 'Mexican' group was further disclosed through the testimony of Polo Arias * * *. [After being transferred to a lower-paying job] he did not ask why * *. [He testified] 'in a company like that you don't ask questions, you just do what they tell you.' Elaborating, a little later he repeated the substance of this answer, and added: ' . . . I am a grown man and I know, you know, what you are supposed to do and what you are not supposed to do, even if you have got the right to do it.' He added that he knew he would not gain anything by asking.

\* \* \* \* \* \*

"It is clear on this record, and I conclude, that the only reason Respondent paid Ruiz $1.50 an hour for seven months while was doing a $1.80 job which five or six Anglos were concurrently paid $1.80 for performing, was because Respondent considered Ruiz and the other minority employees as docile, cheap, labor, and in order to keep them in this condition of servitude. \* \* \* " 23

In the light of these considerations, we conclude that an employer's policy and practice of invidious discrimination on account of race or national origin is a violation of Section 8(a) (1). For the reasons noted above, the case is remanded to the Board for hearings on whether the company here has such a policy and practice. If the Board finds that the company does, the Board shall order an appropriate remedy.

Order affirmed; case remanded for further proceedings.

23. The Examiner's decision also noted:
"  \*  \*  \* An answer of Jessie Ruiz reflected the inner conflict under which a Latin in the area labors. He was born in the United States and has spent all his life in and around West Texas. Asked his race he replied, 'Well, I am a white just as much as anybody else, I would guess, but I am considered as Latin-American.' \* \* \*
\*       \*       \*       \*       \*

PRETTYMAN, Senior Circuit Judge:

I concur in the remand for hearings and findings. As I see it, Section 8(a) (1) of this statute makes illegal any act, policy or program of an employer which interferes with, restrains or coerces employees in the exercise of rights given them by Section 7 of the Act. In the matter before us the complainant alleged that this employer has such a policy and program. In that situation the Board should receive the evidence and make findings. In my judgment it makes no difference what the program is called or how it is catalogued; if, in fact, by its use the employer interferes with, restrains or coerces his employees in the exercise of Section 7 rights, it is an unfair labor practice and is prohibited. I think it is neither necessary nor advisable for us at this time to explore in depth the possibilities of a program such as complainant depicts; I think we should await a finding of the facts. My brethren think otherwise. I concur in the result.

DANAHER, Senior Circuit Judge:

I vote to deny the petition for rehearing filed by Farmers' Cooperative Congress. I believe the Intervenor-Petitioner has misapprehended the import of the court's opinion and the representations made to us are irrelevant in light of our holding.

We had specifically pointed out on this aspect of the case that the question of refusal by the company to bargain in good faith over racially discriminatory practices involves several elements which cumulatively can culminate in a violation of the Act. For example, has the com-

"Some time 'awhile back' Latin Joe Rogers asked his foreman if he could fire watch on Saturdays and Sundays, adding that Rogers needed the money. The foreman said he would look into it. The foreman never mentioned it further, and, consistent with the docility that goes with the prevailing sense of inferiority, neither did Rogers. Rogers has had no overtime on the sprinklers in the last 3 years \* \* \*."

pany developed and practiced a policy of discrimination against its employees? Is that policy, so practiced, "invidious"? Does it reflect discrimination "on account of race or national origin"? In essence "can" that policy and practice constitute a violation of the Act? We did *not* say that such a violation had here been demonstrated. But *if* so established, and in the manner and by such means as we have discussed, the employer's policy and practice *can* violate the Act. That is what we said.

Our remand, in short, called for hearings and a determination as to whether this employer actually had evolved a policy and had put that policy into practice so as to result in *invidious* "discrimination on account of race or national origin." Such is the inquiry which is to be conducted, and properly in my view, with an ultimate conclusion to depend upon the Board's findings. There may *not* be, but assuredly there "can" be a violation in the respects under discussion, and that is what our opinion says. I adhere to it.